185 N.J. Super. 20 (1982)
447 A.2d 192
IN RE 1977 RATE APPEAL OF MONMOUTH MEDICAL CENTER. IN RE 1979 RATE APPEAL FOR MILLVILLE GENERAL HOSPITAL. IN RE 1978 RATE APPEAL FOR MILLVILLE GENERAL HOSPITAL. IN RE 1977 RATE APPEAL FOR MILLVILLE GENERAL HOSPITAL. IN RE 1976 RATE APPEAL OF SADDLEBROOK GENERAL HOSPITAL. IN RE 1978 RATE APPEAL FOR PASSAIC GENERAL HOSPITAL. IN RE 1975 RATE APPEAL OF PASSAIC GENERAL HOSPITAL. IN RE 1976 RATE APPEAL FOR MILLVILLE GENERAL HOSPITAL. IN RE 1979 HOSPITAL RATE APPEAL OF MONMOUTH MEDICAL CENTER. IN RE 1977 RATE APPEAL OF PASSAIC GENERAL HOSPITAL.
Superior Court of New Jersey, Appellate Division.
Argued January 11, 1982.
Decided May 20, 1982.
*23 Before Judges MATTHEWS, PRESSLER and PETRELLA.
Frank R. Ciesla argued the cause for appellants (Giordano, Halleran & Crahay, attorneys).
Andrea M. Silkowitz and Charlotte Kitler, Deputy Attorneys General, argued the cause for respondents (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; John J. Degnan, former Attorney General, and Erminie L. Conley, former Assistant Attorney General, of counsel; Andrea M. Silkowitz, Charlotte Kitler and Dorothy Ann Dygas, Deputy Attorneys General, on the briefs).
*24 Peter T. Manzo, Deputy Public Advocate, argued the cause for the Division of Rate Counsel (Joseph H. Rodriguez, Public Advocate, attorney; Stanley C. Van Ness, former Public Advocate, of counsel; Peter T. Manzo, Dolores P. Wilson and Edward Kopelson, Assistant Deputy Public Advocates, on the briefs).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
These appeals, brought on behalf of four hospitals, challenge final determinations by the Commissioners of Health and Insurance (Commissioners) setting the per diem hospital payment rate at which each hospital may be reimbursed by Blue Cross and Medicaid for services rendered to their subscribers.
The administrative decisions were made pursuant to the Health Care Facilities Act, N.J.S.A. 26:2H-1 et seq. That act declared the public policy of this State to be
... that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health. [N.J.S.A. 26:2H-1]
In accordance with this policy and pursuant to powers granted under the act, the Commissioners each year promulgate, with the approval of the Health Administration Board, Standard Hospital Accounting and Rate Evaluation (SHARE) Guidelines outlining the procedures by which hospital payment rates are to be determined.[1]N.J.S.A. 26:2H-5. Though the guidelines differ in some respects from year to year, they basically establish a consistent method of rate review and determination.
Preliminarily the guidelines require each hospital to submit an itemized proposed budget in the fall preceding the budget year. *25 The submission must include the previous year's anticipated and actual costs as well as the anticipated costs for the coming year. Based upon these projections, the hospital requests a specified rate.
The submitted budget is next reviewed by rate analysts in the Department of Health. In an effort to determine the reasonableness of the hospital's projections and requested rate, a two-step analysis begins. First, a budget base is determined by comparing the previous, or base, year's cost figures with those of similar or "peer group" hospitals. If any of the previous year's costs exceed the cost of the median in the peer grouping by a certain percentile, the excess (called the "base period challenge") is deducted from the base year costs. This budget base is then adjusted to account for various differences projected for the coming year, such as inflation, volume and other economic factors. The hospital's budgeted expenditures which exceed this adjusted base are excluded from the calculation of the new rate,[2] unless the hospital can demonstrate a sound basis for their inclusion. In this regard the hospital may submit additional information in support of its requested rate to the analysts at a detailed review meeting. At the conclusion of this analysis, the hospital receives an administrative payment rate. See In re 1976 Hosp. Reimbursement Kessler Mem. Hosp., 78 N.J. 564, 568 (1979).
Once notified of this rate, the hospital may request an administrative hearing before a Department of Health hearing officer, at which time it may present further evidence on the reasonableness of its disallowed costs. The hearing officer's recommendations are then reviewed by the Commissioners, who determine the final administrative rate.
On these appeals four hospitals challenge the final administrative rate established by the Commissioners. Millville General Hospital (Millville) contests determinations made for the budget *26 years 1976, 1977, 1978 and 1979; Monmouth Medical Center (Monmouth) contests determinations for 1977 and 1979; Passaic General Hospital (Passaic) contests determinations for 1975, 1977 and 1978, and Saddle Brook General Hospital (Saddle Brook) contests a determination for 1976. Though each hospital, except Saddle Brook, challenges unique factual determinations made by the Commissioners, they all contest the basic fairness of the rate-setting procedures on a number of common grounds. For this reason we have chosen to consolidate these appeals and treat all of the issues in one opinion. We treat the unique issues first.

I

Millville General Hospital[3]
Millville maintains that the Commissioners' acceptance of various base period challenges was not supported by substantial credible evidence. As previously explained, the amount by which a hospital's budgeted expenditures exceed the level determined by the analysts to be reasonable is presumed unreasonable and excluded from the calculation of the per diem rate. The amount thus excluded, the "base period challenge," may be reinstated if the hospital can demonstrate that the excess cost is justified and hence reasonable. Such justification, however, must be evaluated in light of the express objectives of the act. A strong showing of necessity based upon unique circumstances *27 is required to overcome the public's interest in cost-efficient health care.
The Commissioners determined that Millville had not met its burden of justification with respect to seven base-period challenges. More specifically, Millville contested challenges to its anethesiology, acute care and intensive care centers in 1976, and challenges to its radiology (physicians), emergency room (physicians), intensive care, acute care and anethesiology centers in 1978. In each case the Commissioners found that the amounts challenged had been properly calculated pursuant to the SHARE guidelines and that the hospital had failed to demonstrate the reasonableness of its budgeted amount. Giving due regard to the Commissioners' expertise, we find sufficient credible evidence present in the record as a whole to support these findings. Close v. Kordulak Bros., 44 N.J. 589, 599 (1965). R. 2:11-3(e)(1)(D).
We do note, however, that the challenge to the anesthesiology cost center in 1978 was the result of the misclassification of a budget item. The Commissioners nonetheless affirmed the challenge, partly on the basis of the SHARE guidelines, which precluded such substitutions, and partly due to the hospital's failure to present evidence with respect to the effect of that reclassification. The refusal of a hearing officer to accept figures submitted by a hospital to correct an earlier mistake is unreasonable. The slavish compliance with departmental guidelines might well render a decision arbitrary. In any event, Millville received a duplication credit in 1978 which would necessarily be offset by the removal of this challenge. For this reason, we sustain the exclusion of the challenged costs.
Millville further asserts that the exclusion of Martland Medical Center and Raritan Valley Hospital from its peer grouping in 1976 and 1977 precluded an adequate and fair comparison and increased the challenges to its budget. These exclusions were justified by the Commissioners on three grounds: (1) the unique diversity and complexity of the case mix in these hospitals; *28 (2) the fact that they are the leading training hospitals in the State and (3) the fact that these hospitals, unlike other hospitals in the peer group, budget according to a fiscal rather than calendar year. Our review of such groupings is limited. As explained in In re Kessler:
While the Department may not act arbitrarily in its peer groupings and comparisons thereunder, we must recognize its expertise and experience in this field and allow it considerable flexibility in the use of the peer comparison mechanism as a rate review tool. [78 N.J. at 571]
Based on our review of the record before us, we conclude that the Commissioners did not act improperly or arbitrarily in excluding these hospitals from Millville's peer grouping.
Millville next contends that the Commissioners acted arbitrarily in not considering the results of the Diagnostic Related Groups (DRG) case-mix studies in determining its rates. The case-mix data resulted from an experimental reimbursement program measuring costs per admission rather than per day. These statistics were excluded by the Commissioners in 1977 and 1978, however, because of the experimental nature of the program, the limited participation in the study and the difficulty in relating case-mix to peer comparison data. In light of the newness of the program and the limited data available, we conclude that the Commissioners' exclusion of such data was neither arbitrary nor unreasonable.
Millville also maintains that for purposes of the wage equalization factor its classification as rural in 1976, 1977 and 1978 was inappropriate and not in accordance with the SHARE guidelines. Pursuant to those guidelines, a hospital is designated rural if it is "located in a place of less than 25,000 population in a county whose population density is less than 250 per square mile...." Millville alleges that the Commissioners erred in not using the updated 1975 census data in applying this regulation rather than the 1970 data, and in interpreting "place" as used in the guideline to mean "geographic area" rather than "service area." A separate regulation, however, clearly provides that the 1970 census figures are to be used. With respect to the Commissioners' *29 interpretation of "place," we note that an administrative agency's construction of its own rules is entitled to great weight. In re Lembo, 151 N.J. Super. 242, 249 (App.Div. 1977). We conclude that the Commissioners' interpretation of this regulation is reasonable and thus find no merit to Millville's contention that it was improperly classified as rural.
Millville notes that in 1979 the SHARE guidelines were amended to create ten geographic categories in place of the three categories  rural, other metropolitan and North Jersey metropolitan  previously employed. Millville views this change as a recognition on the Commissioners' part that the earlier categories were unreasonable. Consequently, it maintains that in order for it not to be penalized in 1979 for the unreasonable geographic area designations previously used, its 1978 budget should be recalculated using the new categories solely for the purpose of reducing its 1979 minimum base period challenge. The Commissioners refused to make this adjustment, however, ruling that to do so would effectively be to apply the new regulations retroactively. The 1979 guidelines, by their express terms, are applicable only to rate determinations made for that year. Moreover, the Commissioners found that Millville had failed to demonstrate that its suggested revision of the 1979 minimum base period challenge was more valid than the calculation used by the Department, since it had not applied the same geographic equalization factor uniformly to all other hospitals in the 1978 peer group. We find that the Commissioners properly rejected Millville's efforts to recalculate its minimum base period challenge.
Millville, in its 1979 appeal, also asserts that it was error for the Commissioners not to include its Hill-Burton obligation in the calculation of its rate. It contends that this obligation is a legitimate cost and as such must be considered pursuant to the *30 mandate of N.J.S.A. 26:2H-18(d).[4] The Commissioners, however, applying accepted principles of accounting, concluded that the obligation was not a true cost but rather a loss or deduction from gross revenue similar to a bad debt or charitable write-off. Moreover, they concluded that in light of the amendments to the act which for the first time treated such losses as costs, the Legislature had not previously intended such obligations to be treated as costs. We agree. We find that the Commissioners' classification of this obligation as a loss was reasonable and not contrary to the provisions of the statute. See Cooper Medical Center v. Boyd, 179 N.J. Super. 53 (App.Div. 1981); Hospital Center at Orange v. Cook, 177 N.J. Super. 289 (App.Div. 1981).
Last, though Millville received time phase relief for its disallowed costs in 1977, it contends that it is entitled to additional relief. Such relief, however, is clearly unwarranted under the SHARE guidelines and was properly denied. Moreover, the Commissioners' denial of time phase relief in 1978, also challenged by the hospital, was mandated by the regulations which preclude such relief where it has been provided in the previous year.

Monmouth Medical Center
Monmouth also contests a number of base period challenges accepted by the Commissioners in the determination of its 1979 rate. These include its blood bank, newborn nursery and delivery, operating and recovery rooms, emergency room (physician and nonphysician), emergency room deficit, renal dialysis, other general services, physical therapy (nonphysician), education and research, laboratory (physician), radiology (nonphysician) *31 and plant cost centers. In each case, however, the Commissioners found that SHARE guidelines had been properly applied and that the hospital had failed to justify the necessity of the excess expenditures. We have carefully reviewed the record and conclude that there was sufficient credible evidence to support these determinations.
Monmouth also objects to the peer comparisons by the Commissioners to its respiratory therapy, central sterile supply and pharmacy costs centers in 1977, and to its acute care and intensive care cost centers in 1979. In each case Monmouth's costs were compared to the median costs of hospitals on a statewide basis. Monmouth contends that its costs in these centers should have been compared instead to the median costs of "major teaching hospitals." This assertion was rejected by the Commissioners on the ground that the hospital had failed to demonstrate that its major teaching status significantly added to costs in these areas. Under these circumstances, and allowing the Commissioners "considerable flexibility" in their peer groupings, we conclude that they did not act arbitrarily in evaluating these costs on a statewide basis.
Last, Monmouth maintains in both of its appeals that it was improperly denied time phase relief. We find no merit in either contention. Monmouth was permitted to submit a time-phase plan by the administrative law judge in 1979 but chose not to. In 1977 the Commissioners granted the hospital substantial relief. Their decision to allow no other adjustments than were explained and warranted was in conformity with the regulations and is sustained.

Passaic General Hospital
Passaic essentially objects to the Commissioners' acceptance of base period challenges to its delivery room, other ancillary cost, operating/recovery room and intensive care cost centers in 1975, and to its intensive care, cardiac care (physicians), physical therapy, patient care and acute care cost centers in 1978. In every instance, the Commissioners found that the *32 amounts challenged had been properly calculated pursuant to the SHARE guidelines and that the hospital had failed to meet its burden of demonstrating the reasonableness of these costs. After carefully reviewing the record, we find sufficient credible evidence to support these determinations.
Passaic also asserts that it was improperly denied time-phase relief in 1977. The hospital, however, accepted time-phase relief of over $500,000 pursuant to a plan initiated by the Department itself. Thus, Passaic's contention in this regard is without merit.

Rate Review Process
In addition to the individual challenges to the Commissioners' determinations, the hospitals contest the basic fairness of the rate review process itself.
First, the hospitals contend that the failure of the hearing officers to allow evidence on the reasonableness of the minimum base period challenge, the accuracy of the economic factor and the validity of the geographic equalization factor was arbitrary, capricious and a denial of due process. We do not agree.
The minimum base period challenge represents the disallowance of the amount of money by which a hospital has overspent its prior year's approved budget. Pursuant to the SHARE guidelines, this amount is deducted from the hospital's current year proposed budget before the new per diem rate is calculated. The hospitals contend that this carry-over process denies them the opportunity to establish the reasonableness of the prior year's overexpenditures.
This argument fails, however, in two respects. First, the hospitals have the opportunity to demonstrate the reasonableness of disallowed costs in the year they are excluded. Once determined unreasonable, there is no sound reason to provide the hospitals with a second chance to justify their excess expenditures. Overspending of a prior year's budget does not *33 transform unreasonable costs into reasonable ones merely because they are carried forward. Thus, the repeated contention of the hospitals that the dollars at issue are not the prior year's dollars but rather the current year's dollars is without merit. Such reasoning would effectively remove all penalties for failure to adhere to the prior year's approved spending levels and subvert the cost containment purpose of the act.
Secondly, the hospitals are provided with an opportunity to demonstrate that the prior year's overspending was reasonably incurred as a result of unanticipated and uncontrollable increases through SHARE "G-16 proceedings." Thus, we conclude that the hospitals are not denied a reasonable opportunity to challenge costs excluded by the minimum base period challenge.
The hospitals further object to the denial of their requests to present evidence on the validity of the economic and geographic equalization factors. The economic factor is a predetermined figure applied globally to all adjusted base period expenses and designed to adjust for inflation. Similarly, the geographic equalization factor is applied by category to eliminate the effects of geographic compensation differentials. Both factors are cost containment tools, quasi-legislative in nature, which are uniformly applied to all hospitals under review.
The assertion made by the hospitals that due process requires individual hearings on the desirability of these factors is patently without merit. There "can be no doubt that a public utility whose rates were being fixed and challenged [is] entitled to notice and hearing." Cunningham v. Civil Service Dep't, 69 N.J. 13, 21 (1975). Rate setting, however, is comprised of various types of decisions. The administrative agency establishes rules and procedures for rate making that affect the entire class of regulatees, and it applies these rules and regulations to a particular hospital in a rate hearing. In arguing that they should have been permitted to submit evidence on the validity of the economic and geographic equalization factors in individual rate hearings, the hospitals are essentially arguing that due *34 process requires individual hearings where an agency seeks to establish rules and procedures generally applicable. Clearly, there is no basis for such a contention. As the Supreme Court has explained:
Where the administrative agency is acting in a general capacity, such as rule making, so that the direct effect of its factual conclusions will be imposed on a class or group, as distinguished from some specific person or persons, then it may well be that such a [quasi-judicial] hearing is not required. [Cunningham v. Civil Service Dep't, 69 N.J. at 22]
A hearing designed to set the rate of reimbursement for individual hospitals is an inappropriate forum in which to evaluate industry-wide standards. Moreover, ad hoc adjudications of the appropriateness of these factors effectively undermine the cost containment objective of the act. We conclude that the Commissioners did not act arbitrarily or capriciously in excluding evidence relevant to the desirability of these factors.
Next, the hospitals maintain that the hearing procedures employed by the Department of Health for rate setting are untimely and result in undue hardships. More specifically, they contend that the failure of the Commissioners to provide them with a final administrative rate determination by the end of the budget year under review results in substantial financial hardship. This hardship conceivably results from a hospital's institution of a program for the rate year in question which is subsequently disapproved well after that year is completed. Though in the years under review there have been significant delays in the determination of the final administrative rate, we do not agree with the hospitals' contentions that such delays were confiscatory or unreasonable.
In order to fulfill the cost-containment objectives of the act, the SHARE guidelines require that hospitals project their costs prior to the year in which they will be incurred. This enables the Department to issue a proposed administrative rate early in the budget year and an administrative payment rate, following the detailed review, by the middle of the budget year. Consequently, the hospitals are on notice at an early date as to which *35 items in their proposed budgets are deemed unreasonable and which costs are justifiable. Thus, unlike the circumstances facing utilities in the cases cited by the hospitals, the SHARE system provides hospitals with immediate approval in the budget year of presumptively reasonable costs. Thus, there is no basis for the hospitals' assertions that they were denied a reasonable rate in the budget year.
It should also be noted that the hospitals under the SHARE system differ from utility companies in that the guidelines provide them with retroactive adjustments to a particular year's rate as to disallowed costs ultimately adjudged to be reasonable.
Similarly, the hospitals have not attempted to show that the rates approved by the Department of Health have failed to meet the standard developed and applied to rent control ordinances when such ordinances are challenged as unconstitutional, i.e., that the rent increases permitted are so low that they are "confiscatory" in failing to allow landlords to realize a "just and reasonable" return on their investments. See, e.g., Helmsley v. Fort Lee, 78 N.J. 200, 210 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979). The court therein concluded that the substantial delays which resulted from the administrative procedure employed to determine a landlord's "hardship" made the ordinance constitutionally defective. 78 N.J. at 228. However, it is clear that before the delay itself can result in striking down the ordinance, there must be a demonstration that the rent control scheme will have "a foreseeable, widespread confiscatory impact." 78 N.J. at 226. No such demonstration has been made on the instant appeals.
We conclude that the delays experienced by the hospitals in the determination of their final rates were not unconstitutional.
Finally, the hospitals contend that the failure of the 1976 through 1979 SHARE guidelines to provide for an evidentiary hearing with regard to the determination of their final payment rate is violative of both the Health Care Facilities Planning Act and procedural due process.
*36 The final rate in question is the one that emerges after retroactive adjustments to the administrative rate have been made. Because the per diem rate is developed from projected costs for the budget year, a final settlement rate is required to reflect the hospital's actual experience in providing health care services. Thus, adjustments, mechanical in nature, are made for actual costs incurred from anticipated volume variances, actual inflationary experience and other similar considerations.
The State contends that the hospitals' due process attack on these procedures is premature and outside the scope of this appeal. We agree. All of these appeals are from the Commissioners' determinations of each hospital's per diem rate. There is nothing in the record which indicates that these rates have been adjusted in accordance with the above-cited guidelines. Even assuming that they have been so adjusted, there is no information with regard to the actual procedures employed by the Department or with regard to the actual final rate set. Considering the record before us, we decline to consider the hospitals' due process challenge to the determination of this rate. Cf. Cooper River Convalescent Center v. Dougherty, 133 N.J. Super. 226, 233 (App.Div. 1975) (we refused to consider equal protection challenge because it "is raised for the first time on appeal, is not supported by the record and, therefore, is not properly before us.")
The hospitals' further contention that the failure to provide such a hearing mechanism violates the Health Care Act is patently without merit. The hospitals cite no section of the act which dictates the procedures that must be employed by the Commissioners in determining what a hospital's total costs are. We conclude that the final rate settlement procedures outlined in the SHARE regulations are not violative of the Health Care Act.
Affirmed.
NOTES
[1] The Health Care Facilities Act was substantially amended by L. 1978, c. 83, effective July 20, 1978. One of the amendments, N.J.S.A. 26:2H-4.1, establishes in the State Department of Health a Hospital Rate Setting Commission of which the Commissioners of the State Departments of Health and Insurance are ex officio voting members. The Commission is vested with plenary power over hospital rates.
[2] The amount excluded is called the "costs questioned."
[3] Preliminarily, we note that both Millville and Passaic in their 1978 appeals urge that the recommendations of the hearing officer, in both cases Murray Klein, be set aside and the matter be remanded for a new hearing since, subsequent to the hearing proceedings but prior to the issuance of his recommended decision, the hearing officer had appeared before the Department of Health in an adversarial capacity. Whether such conduct violates the Conflict of Interest statutes, N.J.S.A. 52:13D-12, as asserted by the hospitals, is a matter best resolved through complaint to the Joint Committee on Ethical Standards. For our purposes, we note that neither hospital has demonstrated any prejudice or bias it has suffered as a result of this alleged conflict, and thus we find no justification for a remand of either matter.
[4] N.J.S.A. 26:2H-18(d), as applicable to this case, provides that the "total cost of a health care facility must be considered in setting hospital rates." The section was amended by L. 1978, c. 83, to require the newly established Hospital Rate Setting Commission to take into account, among other things, "the provision of health care services to individuals unable to pay for them for reasons of indigency" and "bad debts, provided adequate recovery procedures are followed."