573 A.2d 971

ALFRED A. SLOCUM, PUBLIC ADVOCATE OF NEW JERSEY, APPELLANT, v. HOSPITAL RATE SETTING COMMISSION, NEW JERSEY DEPARTMENT OF HEALTH, MOLLY J. COYE, M.D., COMMISSIONER, IN HER OFFICIAL CAPACITY, AND NEW JERSEY HOSPITAL ASSOCIATION, RESPONDENTS.

IN THE MATTER OF THE 1988 LABOR PROXY.

NEW JERSEY HOSPITAL ASSOCIATION, APPELLANT, v. NEW JERSEY STATE DEPARTMENT OF HEALTH, COMMISSIONER MOLLY JOEL COYE, IN HER OFFICIAL CAPACITY, HEALTH CARE ADMINISTRATION BOARD AND HOSPITAL RATE SETTING COMMISSION, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 22, 1990—Decided May 1, 1990.

Before Judges KING, SHEBELL and KEEFE.

*John V. Jacobi,* Assistant Deputy Public Advocate, argued the cause for the appellant *Alfred A. Slocum,* Public Advocate of New Jersey (*Thomas S. Smith, Jr.,* Acting Public Advocate, attorneys; *John V. Jacobi,* on the brief).

*Eileen O'Donnell,* Deputy Attorney General, argued the cause for the respondents New Jersey Hospital Rate Setting Commission (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Michael R. Clancy,* Assistant Attorney General, of counsel; *Eileen O'Donnell,* Deputy Attorney General, on the brief).

*Frank R. Ciesla* argued the cause for the New Jersey Hospital Association (*Giordano, Halleran & Ciesla,* attorneys;

*Frank R. Ciesla,* of counsel; *Karen M. Nagle,* on the brief; *Elizabeth Dusaniwskyj,* on the reply brief).

*Cohen, Shapiro, Polisher, Shiekman and Cohen,* attorneys, admitted amici curiae for Alexian Brothers Hospital, Atlantic City Medical Center, Burdette Tomlin Memorial Hospital, Chilton Memorial Hospital, Cooper Hospital, University Medical Center, Deborah Heart and Lung Center, Elizabeth General Medical Center, Elmer Community Hospital, Kennedy Memorial Hospital University Medical Center, Memorial Hospital of Burlington County, The Memorial Hospital of Salem County, Newcomb Medical Center, Our Lady of Lourdes Medical Center, Shore Memorial Hospital, St. Francis Hospital and Medical Center, South Jersey Hospital System, Underwood Memorial Hospital, Warren Hospital, and West Jersey Health System.[1]

The opinion of the court was delivered by

KEEFE, J.A.D.

These three interrelated appeals resulting from actions taken by the Hospital Rate Setting Commission (HRSC) were consolidated for argument and decision. The first appeal involves a challenge by the Public Advocate to the January 20, 1988 and September 26, 1988 decisions of the HRSC which established the labor component of the economic factor on a state-wide basis for the 1988 rate year. The second appeal is a challenge by the New Jersey Hospital Association (NJHA) to the HRSC's December 21, 1988 decision dismissing the NJHA's request for additional across-the-board increases in the labor component for lack of jurisdiction. The third appeal is also a challenge by the NJHA to the HRSC's decision of September 15, 1989 limiting the time in which individual hospitals could file extraordinary rate appeals for 1988. With the exception of a modification of

---

[1]Two hospitals, Robert Wood Johnson University Hospital and Newark Beth Israel Medical Center, have withdrawn as Amici subsequent to the Court's order permitting participation.

the September 26, 1988 order, we affirm the orders under review.

In order to understand the context in which the HRSC hearings were conducted a review of the relevant statutory provisions of the Health Care Facilities Planning Act (HCFPA), *N.J.S.A.* 26:2H–1 to –26 and the regulations promulgated pursuant thereto, *N.J.A.C.* 8:31B–3.1–7.8, is helpful. In general the HCFPA provides that hospital rates are subject to regulation. The legislative policy to be advanced by the statute is "to provide for the protection and promotion of the health of the inhabitants of the State, promote the financial solvency of hospitals and similar health care facilities and contain the rising cost of health care services." *N.J.S.A.* 26:2H–1.

The HCFPA created three separate but interrelated entities to effect the system for setting hospital rates: the Health Care Administration Board (HCAB), the Commissioner of Health and the HRSC. The HCAB adopts regulations "to effectuate the provisions and purposes" of the HCFPA. *N.J.S.A.* 26:2H–5b. The Commissioner recommends regulations to the HCAB as well as the hospital's PCB and Schedule of Rates to the HRSC. The HRSC was created by statute to "approve or adjust the preliminary cost base" and the "schedule of rates" as proposed by the Commissioner. *N.J.S.A.* 26:2H–4.1b.

In response to its statutory mandate HCAB adopted a series of regulations, *N.J.A.C.* 8:31B–3.1–3.83, which "constitute the minimum necessary steps for implementing Chapter 83," the HCFPA. The regulations contain procedural requirements designed to "establish the process through which the Commissioner of Health shall propose hospital rates to the Rate–Setting Commission, the hospitals may respond, and the Commission shall make final determinations." *N.J.A.C.* 8:31B–3.1(b). The regulations also contain methodological approaches designed to "describe how the Commissioner shall arrive at the rates proposed." *Id.* The methodology by which the Commissioner and

HRSC establish the schedule of rates for each hospital shall be described briefly.

The rate setting system is designed to set a prospective rate of reimbursement in advance of actual treatment which is related to the hospital resources consumed in treating particular illnesses, described as Diagnosis Related Groupings (DRG). *N.J.A.C.* 8:31B–5.1; *Riverside Gen. v. New Jersey Hosp. Rate Setting Comm'n.*, 98 *N.J.* 458, 487 *A.*2d 714 (1985). Each DRG reflects a wide variety of different kinds of costs associated with hospital care. The costs are derived from the actual expenses incurred by a hospital during a base year, in this case 1982, and reported to the Department of Health (DOH). *N.J. A.C.* 8:31B–3.16. A hospital's costs are allocated between two major categories, direct patient care costs and indirect patient care costs. Direct care costs include such things as salaries and fringe benefits for nurses and other employees engaged in the direct delivery of patient care while indirect patient care costs are the equivalent of institutional overhead expenses for managerial, educational, research and maintenance functions. These costs along with other "financial elements" are reported to the DOH for the purpose of arriving at the hospital's current cost base. *N.J.A.C.* 8:31B–3.17. A hospital's current cost base is used to develop its "preliminary cost base" (PCB) and a schedule of rates. *N.J.A.C.* 3:31B–3.16. The legislature defined the PCB as:

> [T]hat proportion of a hospital's current cost which may reasonably be required to be reimbursed to a properly utilized hospital for the efficient and effective delivery of appropriate and necessary health care services of high quality required by such hospital's mixed patients. The preliminary cost base initially may include costs identified by the commissioner and approved or adjusted by the commission as being in excess of that proportion of a hospital's current costs identified above, which excess costs shall be eliminated in a timely and reasonable manner prior to certification of the revenue base. The preliminary cost base shall be established in accordance with regulations proposed by the commissioner and approved by the [Health Care Administration] board. [*N.J. S.A.* 26:2H–2k].

The schedule of rates which a hospital is permitted to charge per DRG is designed to produce net revenue to the hospital

equal to the PCB for each hospital as opposed to the current cost base for the hospital. *N.J.A.C.* 8:31B–3.37. The PCB, therefore, is a function of the statutory purpose in accommodating the two competing policies undergirding the HCFPA, *i.e.*, the financial solvency of hospitals and containment of the rising costs of health care services.

An example of how this competing policy is attempted to be achieved can be found in the treatment of a hospital's reported direct and indirect patient care costs. When the DOH receives a report of such costs from an individual hospital, those costs are compared with a standard developed by the DOH for the hospital's peer group. Each hospital is categorized as either a major teaching, minor teaching or non-teaching hospital. Thus, a reporting hospital's indirect and direct patient care costs are compared against the standard for the category in which it is grouped in order to determine whether those costs are reasonable. *See generally N.J.A.C.* 8:31B–3.22, –3.24. The screening methodology is designed to arrive at a system of "incentives" and "disincentives" so as to promote hospital efficiency by containing costs. If a hospital's costs are below the standard, it is considered to be operating more efficiently than other hospitals in the same categories and is rewarded with an incentive. In such case, the hospital is entitled to charge rates designed to provide it with income in excess of its actual costs in the amount of the incentive. *N.J.A.C.* 8:31B–3.24(b). On the other hand, if the hospital's cost exceed the standard, it is deemed not to be operating as efficiently as its peers and is penalized with a disincentive. *N.J.A.C.* 8:31B–3.24(c). In the latter case, the hospital's rate for that category will be set at a standard which will yield revenues less than the hospital's actual cost.

Therefore, the PCB for each hospital includes among other things a calculation for the "reasonable" direct and indirect patient care costs, as opposed to the actual costs incurred which are a function of the current cost base. In addition the PCB includes an economic factor adjustment on a yearly basis which is designed to be a "measure of the change in the prices of

goods and services used by New Jersey hospitals." *N.J.A.C.* 8:31B–3.26(a). Thus, the PCB is the "reasonable cost" of the financial elements of a hospital's current cost base, "adjusted for projected economic factors" as well as a capital facilities allowance. *N.J.A.C.* 8:31B–3.20. There are various economic factors identified in the regulations which are required to be updated on an annual basis. *N.J.A.C.* 8:31B–3.26(a). For the purpose of this opinion, we shall focus on the labor component of the economic factor, identified in the regulations as the "labor proxy." *Id.* This factor has been identified as being approximately 60% of an average hospital's cost.

■ As indicated, it is the HRSC which must ultimately approve the PCB and the schedule of rates. *Riverside General,* 98 *N.J.* at 462, 487 *A.*2d 714. Briefly stated, the process by which this is accomplished is as follows. For hospitals on a calendar year basis, the Commissioner is required to propose to the HRSC a PCB and a schedule of rates for each hospital by January 31 of the rate year. *N.J.A.C.* 8:31B–3.2. As to those hospitals, all rates "approved or modified" are deemed to be effective as of January 1 of the rate year and any adjustments or modifications resulting from the appeal process are to become effective prospectively and on an "interim basis". *N.J. A.C.* 8:31B–3.42.

The process, therefore, begins with the notification by the Commissioner of a proposed schedule of rates. *N.J.A.C.* 8:31B–3.51. The Commissioner also has the power to issue a proposed schedule of rates "in which particular aspects of the rates are made conditional." As to those aspects, "the rates shall be considered interim." *N.J.A.C.* 8:31B–3.9. Within 45 days of the receipt of the proposed schedule of rates, each hospital must notify the Commissioner and the HRSC of its decision to either accept or not accept the "preliminary cost base." *N.J. A.C.* 8:31B–3.51(b)1, 2. Acceptance by the hospital is "contingent upon approval by the Commission of a Schedule of Rates." *Id.* When the hospital notifies of its decision not to accept, it

must then submit a "list of exceptions" supported by documentation for review by the DOH. The exceptions are then submitted to an analysis by the DOH and further recommendations may issue "regarding the settlement, disposition, or lack of resolution concerning all exceptions raised...." *N.J.A.C.* 8:31B–3.63(a).

Appeal "issues that are common to more than one institution" can be consolidated by the HRSC. *N.J.A.C.* 8:31B–3.63(b). The HRSC may, in its discretion, refer such matters to an administrative law judge for hearing. However, the regulation does not mandate such a referral. *Id.* Deadlines are provided by the regulation in which the HRSC is to make its "final decision", depending upon whether the matter was referred to an administrative law judge or retained by the HRSC. *N.J.A.C.* 8:31B–3.63(b), (d).

Any "modification" ordered by the HRSC to the schedule of rates proposed by the Commissioner must be "consistent with the purpose and intent of [the HCFPA] including but not limited to ... [t]he expressed public policy of [the HCFPA] for cost containment, and financial solvency for institutions that are properly utilized and which deliver effectively and efficiently, appropriate and necessary health care services of high quality required by their mix of patients; ...." *N.J.A.C.* 8:31B–3.64(a)1. In this connection the HRSC "may also consider the reasonableness of any matter within the scope of the legislation not specifically addressed in this subchapter." *N.J. A.C.* 8:31B–3.64(d). Further, "modifications which may be approved as a result of appeals ... shall be implemented through an appropriate interim adjustment to the Schedule of Rates for a given hospital, [or] group of hospitals,...." *N.J.A.C.* 8:31B–3.65(a). Modifications to the Schedule of Rates are "interim" pending "Reconciliation." *Id.* at (b).

Reconciliation is the process by which the hospital's actual net revenue collection is aligned with the HRSC approved schedule of rates. During this process, the DOH computes any

difference between the actual net revenue and allowable net revenue with interest and accordingly adjusts the hospital's schedule of rates for the next year. Under this process, if a hospital's actual costs are in excess of its allowable revenue as to a particular component of an approved DRG, the cost cannot be recaptured unless there has been an appropriate adjustment or modification in the rate schedule. *See In re 1982 Final Recon. Adj. for Jersey Shore Med. Center*, 209 *N.J.Super.* 79, 84, 506 *A.*2d 1269 (App.Div.1986). As will be seen later, it is this process that stimulated the NJHA's petition to the HRSC.

The regulations provide that "the Schedule of Rates itself must be periodically adjusted to reflect changes in inflation" for "direct (variable) financial elements." *N.J.A.C.* 8:31B–3.71(a). Such adjustments "are not dependent upon receipt of reports for a reporting period, and therefore, will be applied to the Schedule of Rates when and as appropriate." *Id.* at (b). "Periodic adjustments are made for any adjustments explicitly ordered by the Commission [HRSC] pursuant to *N.J.A.C.* 8:31B–3.64, Modification of Proposed Schedule of Rates." 8:31B–3.-72(a).

One of the periodic adjustments which the HRSC is permitted to implement is the economic factor. *Id.* at (a)1. The HRSC is required to calculate the economic factor "for each year as soon as the necessary data are available." *Id.* Specifically, with respect to the labor component of the economic factor the regulation provides:

> However, the labor component of the economic factor is to be prospective and final. If calculation of the *final* economic factor for the rate year shows a misprojection of the labor component, the rate year labor component shall not be changed. Instead an equal and offsetting adjustment is to be made to the projected economic factor when the projected economic factor for the upcoming rate year is calculated.

> . . . . . . . .

> The annual recalculation of the economic factor pursuant to *N.J.A.C.* 8:31B–3.-26, shall be based on each hospital's reported expenses of the current cost base by classification for the applicable rate period. [*Id.* (emphasis added)].

*N.J.A.C.* 8:31B–3.72 provides the methodology by which the HRSC determines whether a modification to the schedule of rates is appropriate and how it is to be calculated. It incorporates by reference the provisions of *N.J.A.C.* 8:31B–3.26 which in turn is the methodology by which the Commissioner determines the economic factors for the proposed Schedule of Rates for a given year, specifically the labor proxy as contained in the Bureau of Labor Statistics series Average Hourly Earnings for Non–Supervisory Hospital Worker's (U.S.).

During the reconciliation process the Commissioner is directed to adjust the "[l]abor components ... using the value for each proxy which was applied in calculating the hospital's PCB in that rate year." *N.J.A.C.* 8:31B–3.73(a)1(iii), 19 *N.J.R.* 1145(a); 20 *N.J.R.* 77(a) effective 1/4/88.

The "proxy" referred to in the preceding regulation concerning reconciliation is the labor proxy defined in *N.J.A.C.* 8:31B–3.26, mentioned earlier, which at the time relevant to this appeal, provided as follows:

> The proxy used for labor costs will change in 1983 and subsequent years to the Bureau of Labor Statistics series 'Average Hourly Wages Hospital Worker's (U.S.).'

The HRSC has construed the regulations to require it to adopt a final economic factor containing a labor component based upon the Bureau of Labor Statistic Series Standard for hospital workers current at that given time. It considers such determination to be both prospective in application and final in effect, as required by the regulations. As a result of that interpretation, any hospital that incurred labor costs in excess of the proxy used in the final calculation of the labor component for a given year could recover those excess costs through the reconciliation process only to the extent that the labor costs incurred by the hospital were equivalent to the final BLS series inflationary factor for the given rate year. Conversely, a hospital which incurred labor costs determined by market factors in excess of the average BLS series inflationary factor

for the year in question was unable to recoup those expenses in future years through adjustments in the Schedule of Rates.

It is this methodology utilized by the DOH for the recovery of labor costs that brought about the NJHA's petition to the HRSC from which this appeal stems.

The proceedings leading up to the HRSC's challenged decision of January 20, 1988 consumed some 457 pages of testimony.[2] We need not recount herein the details of the testimony before the HRSC. Suffice it to say that the NJHA, on behalf of its member hospitals, was advised that the Commissioner would recommend a Schedule of Rates for New Jersey Hospitals in 1988 that would reflect the BLS inflation rate of 4.7%, based on the second quarter statistics from 1987, as the labor proxy to be used for the 1988 rate year.[3] The NJHA expressed its concern that New Jersey Hospitals, in general, had incurred labor costs for direct patient care (mostly for nurses' salaries) over the past several years far in excess of the rate of inflation for such wages as reflected by the BLS for the same period of time. Because the BLS standard was used as the labor proxy for proposed and final rates, the hospitals were unable to recoup payments made for wages in excess of the final BLS factor for the rate year in the reconciliation process. The NJHA contended that this state-wide experience was proof that

[2]There were related proceedings in August and September 1987 for which we have not been provided transcripts. Summaries of what occurred at those earlier hearings are disbursed throughout the December 1987 and January 1988 transcripts. We assume that the parties are satisfied that those summaries are sufficiently accurate to inform us of the context of those proceedings. The record reflects the Public Advocate attended all such hearings.

[3]The labor portion of the economic factor for any upcoming rate year is usually determined using second quarter statistics issued by the Bureau of Labor Statistics (BLS). Second quarter information is generally received in September. Therefore, in September of 1987, the Department of Health determined the projected economic factor for labor in 1988 to be 4.7%. This figure was used when the Department issued the proposed 1988 schedule of rates to hospitals on 10/15/87.

the hospitals' predicament was a reflection of true market factors stemming from a lack of nurses as opposed to inefficient hospital management. The NJHA attributed the shortage of nurses, for the most part, to the hospitals' inability to compete in the labor market. The NJHA argued that the Legislature in passing the HCFPA intended hospitals to recoup such losses in order to maintain solvency. It also contended that the BLS was only an average of the labor costs incurred on a national basis and failed to reflect problems peculiar to the northeast region and New Jersey in particular. Because all hospitals were similarly affected, the NJHA sought state-wide relief.

The NJHA requested an 18.7% increase in the adjustment for labor in the 1988 year above the proposed 4.7% BLS rate. Its position was supported by a report commissioned by the NJHA and performed by a firm known as Mathematica.

The DOH commissioned a study by Laventhol and Horvath and requested additional financial information from the NJHA member hospitals. The Commissioner was not in a position in December, 1987 to make a recommendation concerning the labor component of the 1988 rates in response to NJHA's stated concern, but her representative advised the HRSC that the Commissioner would be able to do so by the end of January, 1988. The HRSC entered an interim order concerning the labor component on December 23, 1987 which is not the subject of this appeal.

On January 20, 1988 Commissioner Coye testified before the HRSC that, based upon her review of the relevant studies and economic information gathered from the NJHA, the "fiscal crisis for the system is real." She also said that the "nursing shortage is only one aspect of a very complex problem, but will be the primary focus of my remarks today." *Id.* She summarized the problem as follows:

"Over the last six months, there has been a relatively precipitous decline reported by many New Jersey hospitals in their financial status, and this is supported by recent data compiled by the financing authority. As labor

represents 60 percent of hospitals' total cost, the largest cause of the financial distress has been the inadequate reimbursement through the labor component of the economic factor, inadequate to keep up with rising labor costs. Insufficiencies of reimbursement to cover other new costs such as new technologies, AIDS, and other areas have also been reported."

* * * * * * * *

Succinctly stated, the problem is that hospitals spent more on labor than was allowed by the proxy, and because of our failure to rebase, they had little in the way of funds with which to meet the shortfall. While the hospital spending does not seem to be imprudent, the combination of narrow operating margins, failure to rebase, and generic rate problems such as AIDS, hospital wastes and others already mentioned left hospital administrators with no cushion to apply towards rapidly rising labor rates.

The Commissioner's reference to rebasing was a tacit recognition by her that the base year from which all costs were thereafter adjusted was 1982. Theoretically, rebasing so as to use a more current year's labor cost as a reflection of the reasonable cost of labor would allow a hospital to recoup more of its actual labor costs. The Commissioner pointed out that rebasing was a time consuming undertaking that could not be accomplished in the 1988 rate year but committed the DOH to rebasing all hospitals by 1989. That has apparently now been accomplished.

The Commissioner opined that the shortage of nurses in New Jersey was a result of more than an inability of New Jersey hospitals to compete in terms of wages. She felt that an across-the-board increase in the labor component in the amount requested by the NJHA would not provide hospital administrators with the necessary incentive to address other components of the problem. In addition she observed that the cost to New Jersey consumers for health care was higher than the national average. For that reason she suggested that rate increases must be considered in the context of their impact on payers and consumers. The Commissioner made the following recommendations to the HRSC:

1. The Department will proceed with rebasing during 1988, and has in fact already begun this process.

2. The 1.7 percent adjustment to the 1987 labor proxy approved by the Commission at its December 23, 1987 meeting is recommended to continue.

This results in a 1987 labor proxy floor of 6.3 percent. The actual labor proxy will be the higher of the 6.3 percent or the actual proxy value.

3. In order to simulate rebasing for labor costs, the labor component (i.e., the 1982 base year dollars) should be increased by 4 percent. This adjustment will continue until such time as the Department rebases/recalibrates the hospitals' rates.

      \*       \*       \*       \*       \*       \*       \*       \*

4. To avoid a possible underprojection in 1988 of the correct inflation, the Department recommends another interim 2 percent increase similar to NJHA's 1987 requests. This would increase the original projected 1988 labor proxy of 4.7 percent to a 1988 labor proxy projection of 6.8 percent....4

The financial impact of this recommendation is a total of $266,000,000.

      \*       \*       \*       \*       \*       \*       \*       \*

We are recommending 4 percent plus 2 percent. The 4 percent on a *permanent* basis until we rebase, and the 2 percent on an *interim* basis. [Emphasis added].

After considering the Commissioner's testimony, as well as numerous other witnesses at the hearing, the HRSC adopted the Commissioner's recommendation. In so doing it rejected the NJHA's request that the 1988 labor proxy be increased from 4.7% to 21.7%.

On September 26, 1988 the Commissioner, through her representative, appeared before the HRSC to recommend that the 6.8% interim labor factor be made permanent for the 1988 rate year "due to the need for certainty in budgeting...." He observed that the recommendation by the Commissioner in January, 1988 to increase the labor proxy on an interim basis by 2% over the 4.7% projected by the BLS report was "in anticipation that the actual labor proxy would exceed the original projection." He further observed that the BLS reported inflation rate had increased to 6.337% by the time he testified, as opposed to the 4.7% originally projected. The Commissioner's recommendation that the 6.8% labor proxy be adopted as permanent rather than the current 6.337% BLS rate was because "[t]he department does not believe it will be appropriate or

---

4The HRSC does not adequately explain how an addition of 2% to the 4.7% BLS projected rate equals 6.8%.

administratively easy for the department [or] the hospital[s] to accept or to put in place the lower amount, and that's why we are representing that we leave it at the 6.8 [percent]." The Commissioner's recommendation was unanimously adopted by the HRSC on that date.

At a meeting of the HRSC on November 3, 1988, the NJHA took the position that, although it was satisfied that the HRSC had accepted the NJHA's proposal that rebasing was necessary to resolve the problem, it was dissatisfied with the percentage increases adopted by the HRSC. It proposed that the HRSC approve a 6.5% increase in the 1988 state-wide labor component above that which had already been adopted. The Commissioner responded by observing that the 4% adjustment to the labor base was sufficient to satisfy the immediate needs of the hospitals on a state-wide basis and suggested that "any additional emergent relief be hospital specific."

No formal action was taken by the HRSC on November 3, 1988 in response to the NJHA's request for further across-the-board increases. Instead, the HRSC directed the NJHA to submit its formal "appeal" by way of a "written" submission rather than in the context of the statement made by the NJHA representative at the hearing.

Consequently, on November 28, 1988, the NJHA submitted an appeal to the HRSC requesting a 6.5% increase to the final 1988 labor proxy. The matter was scheduled to be heard at the HRSC meeting of December 21, 1988. On December 15, 1988 the Public Advocate filed its objection to the NJHA's appeal. The Advocate requested that the HRSC dismiss the appeal for lack of jurisdiction or, in the alternative, that the HRSC conduct the public meeting as a contested case hearing. The DOH filed its recommendation against any additional across-the-board relief for 1988 to reiterate the Commissioner's prior testimony in that regard. At the December 21, 1988 hearing, the HRSC determined that it did not have jurisdiction to grant relief from the final 1988 labor proxy because to do so would be engaging

in "rule-making." In the same proceeding the HRSC indicated that its authority to waive the application of a regulation in certain circumstances was limited to individual hospital appeals pursuant to *N.J.A.C.* 8:31B–3.64 and urged hospitals who were truly in need of relief to submit individualized appeals pursuant to that regulation.

The Public Advocate filed a notice of appeal from the HRSC decisions of January 20, 1988 (formalized in a written decision on August 17, 1988) and its decision of September 26, 1988. The Public Advocate named as respondents the HRSC, the DOH, the NJHA and all New Jersey hospitals. We granted the NJHA's motion to dismiss the individual hospitals as parties. Thereafter, we granted the motion of 21 New Jersey hospitals to participate as *amici curiae.*

The NJHA filed a notice of appeal from the HRSC's December 20, 1988 decision, naming as respondents the HRSC, the HCAB, the Commissioner of Health, the DOH and the Public Advocate. By motion, we consolidated the two appeals and ordered the HRSC to:

> prepare and file with this court a detailed written explanation of the basis of its decision of December 21, 1988. Such explanation shall include a description of the relationship between the December 21, 1988 decision and the prior decisions of January 20, 1988 and September 26, 1988.

The HRSC filed a Final Decision and Rate Order on May 12, 1989.

On January 6, 1989 the Executive Secretary of the HRSC promulgated procedures for hospital-specific labor proxy appeals. Those procedures contained no deadline for filing the appeals. On April 17, 1989 the HRSC sent a memorandum informing hospitals that, if they wished to submit an appeal under *N.J.A.C.* 8:31B–3.64, the DOH would apply its extraordinary rate relief appeal criteria. Moreover, the HRSC stated that it would not hear hospital-specific appeals limited solely to labor appeals, although hospitals could identify labor among other elements of cost in an appeal under *N.J.A.C.* 8:31B–3.64. Under those guidelines, the DOH advised hospitals that it

would review the appeal and issue a recommendation within six weeks of receipt of the hospital's complete appeal file.

On September 15, 1989, almost nine months after advising hospitals of its decision, at a briefing of the HRSC by the DOH on the status of extraordinary rate relief appeals, the HRSC suggested that the appeal process be closed.[5] The HRSC unanimously decided to provide hospitals 13 working days from September 15, 1989 in which to submit all documentation needed to process their extraordinary rate relief appeals and notified all hospitals of the October 4, 1989 deadline by letter. The NJHA filed a notice of appeal and moved to modify and stay the administrative action and for temporary emergent relief. We granted a stay of the appeal deadline pending a decision on these matters.

The Public Advocate's appeal presents the general issue of whether the HRSC's decisions of January 20, 1988 and September 26, 1988 concerning the labor component of the economic factor for 1988 were valid. The Advocate argues that the state-wide relief concerning the labor component was erroneous in four respects. First, the decisions were *ultra vires* because the HRSC failed to comply with the statutory and regulatory requirements for labor cost increases. Second, the decisions were invalid exercises of the HRSC's quasi-adjudicative authority both because the HRSC lacks the statutory authority to grant state-wide increases in the labor component, and because it did not comply with the procedural contested case require-

---

[5]By that date 36 of the State's 89 acute care hospitals had filed letters of intent with the DOH to appeal for extraordinary rate relief. Four of the 36 hospitals already had their rate relief appeals approved by the HRSC; three were in process; 16 hospitals had withdrawn their notices of appeal; seven had been notified by the DOH of its intention to recommend against granting relief to them; and the remaining six were considered by the DOH to have abandoned their appeals because of their failure to respond to the DOH's request for necessary information to process their appeals. We are advised that as of the date of briefing, four more appeals had been heard by the HRSC, two of which were approved and two of which were denied. All other hospitals, except two, have officially withdrawn their appeals.

ments of the Administrative Procedures Act for such appeals. Third, the decisions were substantively invalid because they were arbitrary and capricious and unsupported by the evidence. Fourth, the decisions were procedurally infirm because they were contrary to the Public Advocate Act and well-established principles of fundamental fairness and administrative due process. The Advocate further argues that the HRSC's decision following the December 21, 1988 hearing denying NJHA's appeal for state-wide relief on jurisdictional grounds was sound but inconsistent with its prior decisions. In effect, the Advocate argues that HRSC's position in its December 21, 1988 ruling proves its error in the prior two rulings.

█ Generally speaking, the standard of review to be applied to administrative action is whether that action is "arbitrary, capricious or unreasonable or beyond the ambit of the agency's delegated powers." *K.P. v. Albanese*, 204 *N.J.Super.* 166, 175–76, 497 *A*.2d 1276 (App.Div.1985), certif. den. 102 *N.J.* 355, 508 *A*.2d 225 (1985). Our Supreme Court has said that "[i]n light of the executive function of administrative agencies, the judicial capacity to review administrative actions is limited." *Public Serv. Elec. v. New Jersey Dept. of Environ.*, 101 *N.J.* 95, 103, 501 *A*.2d 125 (1985). In that case the Court cautioned that,

the judicial role is restricted to three inquiries: 1) whether the agency action violates the enabling act's express or implied legislative policies; 2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and 3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. [*Id.* at 103, 501 *A*.2d 125].

With reference to the first factor, "[i]t is axiomatic ... that 'the grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals.'" *Barry v. Arrow Pontiac, Inc.*, 100 *N.J.* 57, 70, 494 *A*.2d 804 (1985) (quoting *Gloucester County Welfare Bd. v. New Jersey Civ. Serv. Comm'n*, 93 *N.J.* 384, 390, 461 *A*.2d 575 (1983)). Furthermore, "an agency's express authority is aug-

mented by such incidental authority as may be reasonably necessary or appropriate to effectuate the expressly delegated authority." *In re Solid Waste Util. Cust. Lists,* 106 *N.J.* 508, 516, 524 *A.2d* 386 (1987). A determination that an administrative action is *ultra vires* is highly disfavored. *In re New Jersey Bd. of Public Utilities,* 200 *N.J.Super.* 544, 557, 491 *A.2d* 1295 (App.Div.1985). In construing this very same statute, we had occasion to observe:

> The need of administrative agencies for flexibility in the form of action they deem best suited to promote the policies of the statutes they are charged with administering has been judicially recognized. Considerable weight must be given to their construction of the statute, particularly in light of the technical issues involved. The rate review process is in the nature of *'quasi* legislative' determinations analogous to rate-making for regulated industries. [*Jersey Shore Med. Center,* 209 *N.J.Super.* at 89, 506 *A.2d* 1269 (citations omitted)].

With reference to the second factor, the Supreme Court in addressing an issue raised under the 1971 version of the HCFPA said:

> In this frame of reference, agency determination should be sustained by courts on review if they are supported in the record by evidence which can fairly be regarded as adequate and reliable, taking into account the purposes of the governmental effort, the nature of the administrative function, the complexity of the subject matter, the type and quality of evidence customarily available in the health care field, and the need for administrative expertise in resolving controversies and effectuating the policies of the statute. [*In re 1976 Hosp. Reimbursement Rate for Kesler Mem. Hosp.,* 78 *N.J.* 564, 578–79, 397 *A.2d* 656 (1979)].

Later in a case involving the present version of the HCFPA the Supreme Court observed that "in this complex area where the Legislature has delegated a great amount of discretion to the administrative experts, deference must be accorded to the administrative agency's expertise and experience in its domain." *Riverside General,* 98 *N.J.* at 469, 487 *A.2d* 714.

The Public Advocate argues that the legislative policy expressed in the HCFPA is cost containment. However, as noted earlier, the Legislature also sought to "promote the financial solvency of hospitals" through the HCFPA. Those policies are sometimes in competition. However, we must construe the HCFPA and the regulations promulgated pursuant thereto in

an effort to permit the agencies charged with the administration of the act to effect the appropriate and delicate balance that the Legislature so obviously intends. *N.J.S.A.* 26:2H-4.-1(b) specifically authorizes the HRSC to approve the PCB and appropriate schedules of rates. Moreover, the schedule of rates "shall be reasonable and sufficient to provide the revenue requirements of the preliminary cost base and shall be adjusted from time to time, as appropriate, to reach the certified revenue base." *Id.*[6] The statute defines the financial elements of the PCB. *N.J.S.A.* 26:2H-18(d). One of the financial elements listed is the "reasonable cost" of "direct patient care." *Id.*

The statute provides that the HRSC shall make the "determinations" required of it in *N.J.S.A.* 26:2H-4.1(b) and "hear appeals" concerning those determinations in a "timely manner pursuant to regulation proposed by the commissioner and approved by the board." *N.J.S.A.* 26:2H-18.1(a). In addition to determining the PCB the HRSC may, pursuant to regulations, make "automatic periodic adjustments" to the PCB "for changes in economic factors reasonably calculated to provide for the effects of general economic inflation or deflation." *N.J.S.A.* 26:2H-18.1(b). When such adjustments are made to the PCB, the HRSC may also make "an appropriate change in the schedule of rates to reflect these adjustments." *Id.* Clearly then, once the HRSC initially approves the preliminary cost base for a hospital it may, thereafter, provide for periodic adjustments to the PCB to reflect changing economic factors and conditions.

As indicated earlier, a hospital's PCB for a given rate year is required to reflect economic factors, including the labor compo-

---

[6]The ultimate goal of the HCFPA is to achieve a certified revenue base for each hospital. *New Jersey Hosp. Ass'n v. Department of Health,* 227 *N.J.Super.* 557, 563 n. 2, 548 *A.*2d 211 (App.Div.1988). That goal has not yet been achieved under the HCFPA. However, the certified revenue base is defined in the statute as the PCB, as adjusted by the HRSC pursuant to regulations proposed by the Commissioner and approved by the HCAB to provide for the financial solvency of the hospital. *N.J.S.A.* 26:2H-21.

nent. *N.J.A.C.* 8:31B–3.2. Specifically, the economic factor and the labor component of that factor is identified in the regulations as a "periodic adjustment" which is made to the schedule of rates and is "not dependent upon new submissions of reports." *N.J.A.C.* 8:31B–3.72(a). Thus, the labor component applies across-the-board to all hospitals, regardless of their annual submission of financial reports. *Id.*

The Advocate admits that the statute permits such adjustments by the HRSC. However, he argues that "[t]he labor proxy, in distinction to other elements of the economic factor, is set prospectively, and may not be varied during the rate year." His argument relies upon the provision of *N.J.A.C.* 8:31B–3.-72(a)(1) which states:

> Economic factor: The final economic factor shall be calculated for each year as soon as the necessary data are available. However, the labor component of the economic factor is to be prospective and final. If calculation of the final economic factor for the rate year shows a misprojection of the labor component, the rate year labor component shall not be changed. Instead an equal and offsetting adjustment is to be made to the projected economic factor when the projected economic factor for the upcoming rate year is calculated.

In addition to the preceding regulation, the Advocate points to the provisions of *N.J.A.C.* 8:31B–3.26(b) which provides: "[t]he proxy used for labor costs will change in 1983 and subsequent years to the Bureau of the Labor Statistics series 'Average Hourly Wages Hospital Worker's (US).' " He argues that when the two regulations are read together it is clear that the BLS rate in effect at the beginning of the rate year must be used as the labor proxy for that rate year and that the proxy cannot be changed during the rate year. He contends that this interpretation is required "[i]n the interest of prospective and predictable rates."

The HRSC agrees that the BLS rate must be used as the labor proxy component of the economic factor. It also agrees that once the final economic factor is determined by the HRSC, the labor component cannot be adjusted even if there is a misprojection of labor costs for the rate year. The HRSC contends, on the other hand, that it had not adopted a "final"

labor component of the economic factor for the 1988 rate year prior to the January 20, 1988 hearing. The HRSC contends that the 6.8% labor proxy component was adopted by it at that time on an "interim" basis because it believed that the BLS rate of 4.7% was not an accurate projection of the inflationary trend for labor costs to be incurred during the rate year. It points out that its prediction was verified by the BLS rate published in June 1988 which showed a marked increase in the inflation rate closely approximating 6.8%.

In sum, the HRSC contends that its actions in January, 1988 approving a 4% across the board increase to the PCB for labor costs was a function of its power in approving adjustments to the PCB on a periodic basis to reflect unrecovered but reasonable expenses incurred by reason of "general economic inflation." *N.J.S.A.* 26:2H–18.1(b). It further argues that its decision concerning a 6.8% labor proxy to reflect projected inflationary trends for the rate year was only "interim" and not final and, because it was not final, it was not required to adopt the 4.7% BLS rate in existence at that time.

For the most part, we agree with the HRSC's interpretation of the statute and regulations. While the general intent of the statute and regulations is to adopt a schedule of rates that is both prospective and predictable, *New Jersey Hosp. Ass'n*, 227 *N.J.Super.* at 562, 548 *A.*2d 211, there is nothing in the statute which prohibits the use of an interim rate where the circumstances warrant it. As indicated earlier, the Commissioner is authorized by regulation to make certain aspects of the proposed schedule of rates "conditional" and "with respect to [those] aspects, the rate shall be considered interim." *N.J.A.C.* 8:31B–3.9. Obviously, since the HRSC is charged by statute with approving all proposed schedules of rates, any approval of such rates containing a conditional provision must necessarily be considered an "interim" order of the HRSC.

The Advocate misconstrues the HRSC's interim action and labels it an illegal adjustment to the labor proxy during the rate

year in violation of 8:31B–3.72. The real issue is whether the HRSC had the power to act on an interim basis until the appropriate BLS rate for the year can be ascertained. However, as explained earlier, there is no statutory prohibition against the HRSC acting on an interim basis while there is clear regulatory authority permitting such action to be taken.

There was more than sufficient evidence presented before the HRSC from which it could conclude that the projected 4.7% BLS rate of inflation was not an adequate projection of the cost of labor for the 1988 rate year. There was also adequate support in the record for its conclusion that an adoption of the 4.7% rate without any adjustment to the labor component of the 1982 base year would create a financial crisis for the State's hospitals. Under the circumstances, its decision to provide a prospective labor rate on an interim basis was justified. The BLS rate for labor as published in June, 1988 retrospectively supports the HRSC's decision in that regard.

In order to observe its statutory and regulatory mandate to make the schedule of rates both prospective and predictable, the HRSC was required to establish the final labor component of the economic factor as soon as it could do so. Its decision in September, 1988 to take final action in response to the June publication of the BLS statistics was both reasonable and timely. However, in deciding to make the 6.8% interim rate final, the HRSC erred. The regulations clearly require that the final labor component of the economic factor adopted by the HRSC be the BLS rate in force at the time the HRSC takes final action. *N.J.A.C.* 8:31B–3.72(a)(1). Thus, the HRSC should have adopted the June 1988 BLS rate of 6.337%. As modified, the orders of the HRSC of January and September 1988 are affirmed.[7]

---

[7] We assume the necessary adjustments will be addressed through the reconciliation process.

■ The Public Advocate contends that the regulatory limitation on the power of the HRSC to grant increases to the labor proxy was recognized by the HRSC in its decision of December 21, 1988 at which time it denied the NJHA's request for an additional 6.5% increase in the labor proxy. However, the Advocate misperceives the basis for the HRSC's action at that time. The HRSC simply observed that once it made a final determination of the labor proxy for the 1988 rate year, its decision was prospective and final. *See* Final Decision and Rate Order of December 21, 1988. *N.J.A.C.* 8:31B–3.72(a)1 specifically provides that if the establishment of that final rate "shows a misprojection of the labor component, the rate year labor component shall not be changed." The only remedy provided under the regulation in such instances is to allow an "equal and offsetting adjustment" in the next rate year. *Id.* The HRSC correctly observed that any deviation from the specific provision of the regulation would constitute rule making rather than an interpretation of the regulations. Thus, we conclude that the HRSC acted appropriately when it denied the NJHA's request for an across-the-board 6.5% increase in the labor proxy once it had been made final. An agency's action cannot be sustained where it has "the effect of amending a regulation which [was] previously promulgated." *Shapiro v. Albanese*, 194 *N.J.Super.* 418, 429, 477 *A.2d* 352 (App.Div. 1983). *See also Radiological Soc. v. New Jersey State Dept. of Health*, 208 *N.J.Super.* 548, 558–59, 506 *A.2d* 755 (App.Div. 1986), certif. den. 104 *N.J.* 444, 517 *A.2d* 434 (1986). For those same reasons, we dismiss the NJHA's challenge to the HRSC's denial of its November, 1988 appeal.

In connection with the same December, 1988 order, the NJHA also argues that the HRSC's dismissal of its appeal on jurisdictional grounds amounts to wage discrimination against women. Further, it contends that the HRSC's refusal to adjust hospital rates resulted in an unconstitutional taking of property without just compensation. Both of these contentions are without merit. *R.* 2:11–3(e)(1)(E). The regulatory scheme prohibit-

ing adjustments in the labor component once it has been finally set by the HRSC for the rate year is rationally related to a valid legislative policy, *i.e.*, cost containment. Further, the HRSC acknowledged that the regulations permit relief from the strict application of regulations in individual cases. *N.J.A.C.* 8:31B–3.64. Therefore, an avenue for further relief was left open for members of the NJHA.

Further, in order to prevail under the Equal Pay Act, 29 *U.S.C.A.* § 206(d), or Title VII of the Civil Rights Act of 1964, 42 *U.S.C.A.* § 2000e–2h, the NJHA must show that an employer set wages differently for employees of opposite sexes performing comparable work. *County of Washington v. Gunther,* 452 *U.S.* 161, 101 *S.Ct.* 2242, 68 *L.Ed.*2d 751 (1981); *Corning Glass Works v. Brennan,* 417 *U.S.* 188, 94 *S.Ct.* 2223, 41 *L.Ed.*2d 1 (1974). Clearly, not all nurses are female, and even if they were the labor component rates applied to all hospital workers. Thus, this clearly is not a case where women are being discriminated against based on gender since both males and females are affected by the HRSC's rate setting scheme.

■ The Public Advocate also challenges the authority of the HRSC to order relief on a state-wide basis. We find nothing in the statute which prohibits the HRSC from considering common issues as they might affect approval of, or appeals from, its decision concerning the PCB and Schedules of Rates. We have previously observed that "[t]he economic factor is a predetermined figure applied globally to all adjusted base period expenses and designed to adjust for inflation.... [It is a] cost containment tool[ ] *quasi*-legislative in nature, [and is] uniformly applied to all hospitals under review." *In re Monmouth Med. Center Rate Appeal,* 185 *N.J.Super.* 20, 33, 447 *A.*2d 192 (App.Div.1982). We noted further that "[a] hearing designed to set the rate of reimbursement for individual hospitals is an inappropriate forum in which to evaluate industry-wide standards." *Id.* at 34, 447 *A.*2d 192. An administrative agency

"must possess the ability to be flexible and responsive to changing conditions.... [The judiciary] must defer to the choice made so long as the [agency's] selection is responsive to [its] purpose and function...." *Radiological Soc.,* 208 *N.J.Super.* at 560, 506 *A.*2d 755. As pointed out earlier, the regulations relative to the appeal process permit the HRSC to consolidate cases involving common issues. *N.J.A.C.* 8:31B–3.63(b). The NJHA's application to the HRSC prior to the January 20, 1988 order was technically an appeal from the proposed Schedule of Rates previously recommended by the Commissioner containing the 4.7% labor proxy. The HRSC's decision to address the problem on a state-wide basis is inferentially, if not directly, authorized by the regulations and fosters efficiency and economy in the rate setting process. Clearly, at that point in the proceedings the NJHA was the appropriate party to present the state-wide issue on behalf of its member hospitals. *See Crescent Park Tenants Ass'n v. Realty Equity Corp. of N.Y.,* 58 *N.J.* 98, 275 *A.*2d 433 (1971).

The Public Advocate contends that, notwithstanding a determination by us that the HRSC had the substantive authority to order an adjustment to the labor base and enter an interim order affecting the labor proxy, the procedure by which it was accomplished is flawed. The Advocate argues that it was entitled to a contested case hearing pursuant to the provisions of *N.J.S.A.* 26:2H–18.1(d). The issue requires an analysis and interpretation of the three subsections of the statute in question. *N.J.S.A.* 26:2H–18.1(b), (c), (d).

All parties to this litigation apparently concede that there is some ambiguity concerning how the provisions of *N.J.S.A.* 26:2H–18.1(b), (c) and (d) were intended by the Legislature to interrelate. The Advocate proposes to resolve the ambiguity by relying upon a legislative statement concerning subsections (b) and (c) when *N.J.S.A.* 26:2H–18.1 was added in 1978. The legislative statement relied upon is as follows:

The bill provides for adjustments to be made in hospitals' certified revenue bases when there are changes in the economy (e.g. inflation) and in 'statutes and regulations affecting the delivery of health care' (subsection b. and c.).

We agree that the legislative history is relevant but it does not conclusively lead to the result proposed by the Advocate.

It must be remembered that the Legislature intended that hospitals eventually progress from the use of a PCB to a certified revenue base (CRB). *New Jersey Hosp. Ass'n.*, 227 *N.J. Super.* at 563 n. 2, 548 *A*.2d 211. However, that transition has not yet been accomplished. *Id.* The difference between the two is that by the time a CRB is reached certain inefficiencies previously allowed by the HRSC in the hospitals' PCB will be removed. (*Compare N.J.S.A.* 26:2H–2(k), the definition of preliminary cost base, *with N.J.S.A.* 26:2H–2(*l*), the definition of certified revenue base.) However, regardless of whether a PCB or a CRB is used, adjustments will still have to be made by the HRSC for economic factors. That is precisely what *N.J.S.A.* 26:2H–18.1(b) provides, and, as we have indicated earlier, that provision of the statute is the main source for the HRSC's authority in this case.

The Legislature was addressing two interrelated adjustments when it drafted subsections (b) and (c) of the statute: (1) adjustments for "changes in the economy (e.g. inflation)" and (2) adjustments required by "statutes and regulations affecting the delivery of health care." Legislative Statement to L.1978, c. 83, § 11, eff. July 20, 1978. Subsection (b) permits adjustments for economic changes to the "preliminary cost base or certified revenue base" while subsection (c) permits adjustments required by "statutes and regulations affecting the delivery of health care" to "certified revenue bases." The Advocate contends that the omission of a reference to the PCB in the latter subsection is significant. We disagree. The legislative history suggests that, both considerations were of equal importance to the Legislature and both would be required whether a hospital was operating under a PCB or a CRB. Therefore, we conclude that the omission of the words "preliminary cost base"

from subsection (c) was an oversight, probably brought about because there is little difference between the two concepts when adjustments for these factors are being considered. We note for example that the words "certified revenue bases" are used in the legislative history previously quoted when both adjustments are discussed, yet it is clear from the statute itself that adjustments to PCBs were permitted by the provisions of subparagraph (b). Thus, we conclude that the HRSC may make either of the two adjustments mentioned in subsections (b) and (c) to the PCB of one or more hospitals as the circumstances require.

In this case the HRSC's hearings were a hybrid of the adjustments permitted under both subsections (b) and (c). As we stated earlier, the HRSC was making an adjustment to the PCB of all hospitals for economic factors under subsection (b). However, it was also making an adjustment to the PCBs because the reconciliation process resulting from the regulations then in effect were preventing hospitals from recouping labor costs in excess of the BLS proxy in effect at the end of a given rate year, even though those excess costs were influenced by true market trends and circumstances peculiar to New Jersey rather than inefficiencies in hospital administration. In some part the hospitals' dilemma was also caused by the failure of the DOH to rebase after 1982. Further, the circumstances were such that salary inflation was progressing far in advance of predictions based on BLS statistics. (The statistics were as much as six months old when the Commissioner announced the proposed schedule of rates for 1988.) From those circumstances, the HRSC could properly conclude that all such events were adversely "affecting the delivery of health care" in terms of its "effectiveness and efficiency" and that those inequities stemmed, in part, from certain regulations or the methodology of their application. *N.J.S.A.* 26:2H–18.1(c).

We reject the Public Advocate's argument that the procedure authorized by subsection (c) of the statute refers only to adjust-

ments brought about by "changes" to statutes or regulations, as opposed to the impact of current regulations on the hospitals' PCB or CRB brought about by changed circumstances. There is nothing in the statute or legislative history that compels the conclusion advanced by the Public Advocate. Because the HRSC was appropriately proceeding under subsections (b) and (c) of the statute we hold that the contested case procedure, which may result from actions taken under subsection (d), does not apply.

■ The HRSC followed the procedure permitted by subsection (c) of the statute which provides:

> Where appropriate the commission may sit en banc and hold public hearings in order to obtain the evidence required to support its conclusions and determinations. In the case of such hearings the commission shall provide actual notice to the affected planning and licensing authorities and hospitals, and to the commissioner and the Public Advocate. [*N.J.S.A.* 26:2H–18.1(c)].

This provision is sanctioned by well established case law on the subject. Even where hearings are required, full-blown trials are unnecessary. *In re Matter of Public Hearings,* 142 *N.J. Super.* 136, 151, 361 *A.*2d 30 (App.Div.1976), certif. den. 72 *N.J.* 457, 371 *A.*2d 62 (1976). Generally speaking, quasi-legislative hearings do not require the full adversarial process. Only where adjudicative facts are in issue is a trial-type hearing necessary. *In re Solid Waste,* 106 *N.J.* at 517, 524 *A.*2d 386. Appellate courts in this State have recognized that the HRSC is a quasi-legislative body, despite the fact that HCAB has rule making authority. *In re Barnert Mem. Hosp. Rates,* 92 *N.J.* 31, 41, 455 *A.*2d 469 (1983); *Jersey Shore Med. Center,* 209 *N.J.Super.* at 89, 506 *A.*2d 1269.

■ We also disagree with the Public Advocate's contention that the procedure followed by the HRSC prevented the Public Advocate from performing his statutory duties and denied him adequate administrative due process. As indicated earlier in this opinion, the NJHA's request for adjustments to the labor base component and labor proxy was the subject of several HRSC meetings going back as far as mid–1987. The Public

Advocate was in attendance at each of those hearings and was aware of the fact that the NJHA and the DOH had commissioned studies on the subject. The Public Advocate could have hired its own expert at any time during those months that preceded the January, 1988 hearings. Further, the HRSC decision in January 1988 was "interim" with reference to the labor proxy. Additional proceedings where anticipated after the January hearing. Certainly nothing prevented the Advocate from presenting expert testimony thereafter.

■ Finally, we address the NJHA's contention that the HRSC has violated New Jersey's Administrative Procedure Act (APA) and its authority under the HFCPA in establishing a deadline for extra-ordinary rate relief appeals. Alternatively, the NJHA contends that the deadline was arbitrary, capricious and unreasonable. We reject both claims. The NJHA's standing to prosecute this particular appeal as opposed to the appeal from the December 21, 1988 order, is doubtful. It is well settled that standing requires that a party have a sufficient stake and real adverseness with respect to the matter in controversy and a substantial likelihood that it will suffer some harm in the event of an unfavorable decision. *New Jersey Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n.*, 82 *N.J.* 57, 67, 411 *A.*2d 168 (1980). We recognize that the Supreme Court has given standing to associations even though the harm may not be technically to the association but to its constituents. *Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y.*, 58 *N.J.* 98, 275 *A.*2d 433 (1971). However, in the instant controversy, the deadline from which the NJHA appeals applies only to those appeals that may be filed pursuant to *N.J.A.C.* 8:31B–3.64. That regulation is expressly limited to individual hospitals. HRSC encouraged hospitals to utilize that avenue of appeal on December 21, 1988 when it denied the NJHA's last appeal to give additional across-the-board relief after the final 1988 labor proxy had been adopted by HRSC. The NJHA has standing to appeal from the December 21, 1988 decision because that appeal affected all the

hospitals on a state-wide basis. However this later appeal affects only individual hospitals.

In this particular appeal the NJHA is not representing the interest of its entire constituency. As noted earlier, many New Jersey hospitals have processed or withdrawn their extra-ordinary rate relief appeals. Therefore, the issue presented by this appeal does not fall within the category of "common grievances" recognized in the *Crescent Park* opinion as a basis for standing. *Crescent Park,* 58 *N.J.* at 109, 275 *A.2d* 433.

However, even assuming that the NJHA has standing to prosecute this appeal, we find that the HRSC did not engage in rule making and that its decision was not arbitrary, capricious or unreasonable.

The Administrative Procedure Act defines a rule as an agency statement of "general applicability and continuing effect that implements or interprets law or policy...." *N.J. S.A.* 52:14B–2(e). The leading case in New Jersey discussing the factors which give rise to an administrative rule is *Metromedia, Inc. v. Director of Div. of Taxation,* 97 *N.J.* 313, 478 *A.*2d 742 (1984). In that case, the Supreme Court enumerated six features of an administrative rule. An administrative rule: (1) applies to a large segment of the regulated or general public; (2) applies generally and uniformly to all similarly situated persons; (3) operates only prospectively; (4) is a directive that is not otherwise expressly provided by or inferable from enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency position or (ii) materially and significantly changes past agency position on the identical subject; and (6) is in the nature of the interpretation of law or general policy. *Id.* at 331–32, 478 *A.2d* 742. All six of these factors need not be present in order for an agency's actions to be characterized as rule making. *In re Solid Waste,* 106 *N.J.* at 518, 524 *A.2d* 386. Instead, the factors must be weighed and not tabulated. *Id.*

HRSC maintains that the October 4, 1989 deadline does not constitute rule making, but rather, was an informal agency action necessary to supervise a regulated industry. In making that argument HRSC relies upon *In re Solid Waste*. That case involved a challenge to a Board of Utilities' order directing Solid Waste Utilities to provide it with a list of its customers. The utility charged that the Board's action was invalid because of its failure to comply with the rule making provisions of the APA. In dismissing the challenge, the Court ruled that "[t]he requested information was necessary for the exercise of the Board's authority to ensure efficient and reasonable solid waste collection and to prevent anti-competitive practices." *Id.* at 516, 524 *A.*2d 386. Therefore, the Court reasoned that "[v]iewed realistically, the issuance of the order is not so much an attempt to make a rule as it is one to obtain information that the Board needs to do its job." *Id.* at 518, 524 *A.*2d 386.

In the instant case it is undisputed that the HRSC has plenary power to hear extraordinary rate relief appeals on an individual hospital basis. *N.J.A.C.* 8:31B–3.64(c). The HRSC did not attempt to reduce the deadline in which appeals can be taken to less than the 45 day appeal process referred to in *N.J.A.C.* 8:31B–3.51(b). Instead, because there was apparently a belief that individual appeals would be numerous, the HRSC attempted to establish guidelines in order to allow it to manage or supervise the processing of the appeals. Such "informal action constitutes the bulk of the activity of most administrative agencies." *In re Solid Waste*, 106 *N.J.* at 518, 524 *A.*2d 386.

Although the HRSC did not hold the individual hospitals to the 45 day period mentioned earlier, the cut-off deadline was adopted by it only after the DOH expressed concern over the fact that many hospitals were ignoring its prior request for information needed to formulate recommendations for the HRSC to act upon. In the DOH's view, the hospitals' failure to provide necessary information was causing the appellate process to become an overly drawn-out problem for both the DOH

and HRSC. Under those circumstances, we see no reason why the HRSC was not permitted to put a limit on its largess. The HRSC had expressly invited hospitals to avail themselves of the regulatory appeal process nine months earlier, on December 21, 1988, if the hospitals needed relief from the strict application of the order that set their 1988 labor rates. By October 4, 1989, the hospitals were well aware of the impact that the final 1988 rate had on their financial position. The HRSC's order was simply an attempt to obtain the information it needed to complete its job. *In re Solid Waste,* 106 *N.J.* at 519, 524 *A.*2d 386. The decision was made after due reflection and after considering the hospitals' views on the subject at a public hearing on September 15, 1989. Under the circumstances, it was a reasonable decision. Therefore, we dissolve the temporary restraint imposed on October 4, 1989.

As modified, the orders entered by the HRSC under review are affirmed.