NEW JERSEY HOSPITAL ASSOCIATION, PLAINTIFF–APPELLANT, v. NEW JERSEY STATE DEPARTMENT OF HEALTH, HOSPITAL RATE SETTING COMMISSION, MOLLY COYE, COMMISSIONER OF HEALTH, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 4, 1988—Decided September 19, 1988.

558

Before Judges FURMAN, BRODY and LONG.

*Frank Ciesla* argued the cause for appellant (*Giordano, Halleran & Ciesla,* attorneys; *Karen M. Nagle,* on the brief).

*Eileen O'Donnell,* Deputy Attorney General argued the cause for respondent (*W. Cary Edwards,* Attorney General, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

LONG, J.A.D.

On December 12, 1985, Congress enacted the Balanced Budget and Emergency Deficit Control Act, 2 *U.S.C.A.* § 901 et *seq.* (Gramm–Rudman) which requires reduction in federal program payments if the federal budget deficit exceeds targeted amounts. Effective March 1, 1986, Medicare payments to New

Jersey hospitals were reduced by 1% under 2 *U.S.C.A.* § 906(d). On February 28, 1986, the New Jersey Department of Health (DOH) presented to the Hospital Rate Setting Commission (HRSC), a public body authorized to set hospital rates (*N.J.S.A.* 26:2H–4.1) four alternative methods of addressing the Gramm–Rudman reduction:

(1) Reallocate to other payers the 1% reduction to the extent that it is less than or equal to the hospital's uncompensated care attributable to Medicare.

(2) Determine that the reduction applies proportionately across all payments and reallocate only the uncompensated care portion of the 1% reduction by use of hospital-specific uncompensated care percentages. Using this approach a hospital with 7% uncompensated care would have 7% of the reduction reallocated to other payers.

(3) Determine that the uncompensated care portion of the 1% reduction is an amount between that produced by option (1) and option (2).

(4) Define the 1% reduction as a Medicare withholding and implement the withholding methodology which was previously approved by the Commission.

The HRSC notified "all interested and affected parties" and the chief financial officers of all New Jersey hospitals of the policy alternatives presented by the DOH and requested comments by April 11, 1986. The DOH received comments from approximately 26 hospitals before the announced deadline and accepted further comments up to December 1986. Among the comments was that of the New Jersey Hospital Association (NJHA) which argued that the Gramm–Rudman reduction should be allocated to other payors.

On December 19, 1986, the HRSC convened to review the DOH proposals. The DOH recommended Option 2—that the reduction be applied proportionally across all Medicare payments and that only the uncompensated care portion of the 1% reduction (based on hospital specific uncompensated care percentages) be reallocated to non-Medicare payors. In other words, under Option 2 a hospital with 7% uncompensated care (the state-wide average) would receive 7% of the 1% Gramm–Rudman reduction from other payors and would be required to absorb the difference. The DOH also recommended that a hospital experiencing hardship as a result of the allocation

should be allowed to appeal. Commenting on the DOH's recommendation, the Chairman of the HRSC observed that:

[t]he department's recommendation is based upon its characterization of the Gramm–Rudman legislation as having overreaching powers that outweigh the hospital's reference to Chapter 83's [*N.J.S.A.* 26:2H–1 *et seq.*] guarantee of full financial elements. Therefore, the department contends that it would be inappropriate to simply pass along the shortfall to other payors.

After hearing comments from various industry representatives, raising numerous issues and requests for further examination of the financial effects of the various allocation options, the transcript of the HRSC's meeting reflects that the following took place:

MR. PAYNE: Then, we would, at this point, be prepared to take a motion.

I will move that we accept the recommendation of the department which relates only to the uncompensated care portion of the one percent of hospitals' specifically uncompensated care percentages.

Is there a second to the motion?

MS. POWERS: I will second the motion.

I have one question.

In terms of how it is to be reallocated, whether it is an across the board or whether it is hospital specific uncompensated care.

MS. DICKSON: The hospital's specific—

MS. POWERS: Your recommendation is hospital specific so that would be part and parcel in agreement with that?

MS. DICKSON: Yes.

MR. PAYNE: All right.

May I have a second to the motion.

MS. POWERS: Second.

MR. PAYNE: It has been properly moved and seconded.

All those in favor signify by saying aye.

(At which time Mrs. Powers, Mr. Payne, Ms. Kitler and Mr. LaFalce voted in favor of the motion.)

MR. PAYNE: Opposed?

MR. CORNETTA: Opposed.

MR. PAYNE: Abstentions?

There are four in favor with one opposition.

Then, the recommendation of the department is approved.

The HRSC thus adopted Option 2. This had the practical effect of allocating $870,000 of the $9.8 million dollar Gramm–Rudman reduction to other payors and requiring the state's hospitals to absorb the nearly $8.9 million dollar difference.

This appeal by NJHA followed.  NJHA raises several claims, among them that the action of the HRSC was substantively flawed insofar as it failed to take into account provisions of the Health Care Facilities Planning Act (HCFPA), *N.J.S.A.* 26:2H–1 *et seq.*, and procedurally defective for failure to adhere to the provisions of the Administrative Procedure Act (APA).  *N.J. S.A.* 52:14B–2(e).  We agree with both of these contentions and reverse and remand the case for proceedings consonant with this opinion.

The HCFPA provides that hospital rates of reimbursement are subject to regulation.  A detailed history of HCFPA which constitutes the backdrop for this appeal is set forth in *Riverside General v. N.J. Hosp. Rate Setting Comm'n,* 98 *N.J.* 458, 461–464 (1985).  The Act authorizes the Commissioner of the DOH to regulate hospital rates charged to all payors including Blue Cross, state governmental agencies and private insurance carriers as a means of containing the rising costs of health care.  *N.J.S.A.* 26:2H–18.

The rate-setting system is designed to set a prospective rate of reimbursement in advance of actual treatment, which is related to the hospital resources consumed in treating particular illnesses (as opposed to particular patients), categorized as Diagnosis Related Groupings (DRG).  *N.J.A.C.* 8:31B–5.1. Each DRG reflects a wide variety of different kinds of costs associated with hospital care.  These costs are derived from the actual expenses incurred by a hospital during a base year and reported to the DOH.  *N.J.A.C.* 8:31B–3.16.  The reported costs are allocated generally between two major categories: (1) direct patient care costs, such as salaries and fringe benefits for nurses, dieticians and other employees engaged in the direct delivery of patient care, *see N.J.A.C.* 8:31B–3.21, 8:31B–4.32, and (2) indirect patient care costs, or the institutional overhead expenses for managerial, educational (including residents in teaching programs), research and maintenance functions, *see N.J.A.C.* 8:31B–3.24(a).  Both direct and indirect patient care costs are then screened for reasonableness by comparison with

a standard developed for the hospital's peer group as a major teaching, minor teaching or non-teaching hospital, *N.J.A.C.* 8:31B–3.22, 8:31B–3.24.[1] Ultimately, the HRSC establishes a rate schedule for each hospital which blends its actual costs with the standard.

The identification and quantification of direct and indirect patient care costs into "financial elements" becomes a hospital's "current cost base" which is used to develop its "preliminary cost base" (PCB) and a schedule of rates. *N.J.A.C.* 3:31B–3.16. PCB is defined as:

> that proportion of a hospital's current cost which may reasonably be required to be reimbursed to a properly utilized hospital for the efficient and effective delivery of appropriate and necessary health care services of high quality required by such hospital's mix of patients. The preliminary cost base initially may include costs identified by the commissioner and approved or adjusted by the commission as being in excess of that proportion of a hospital's current costs identified above, which excess costs shall be eliminated in a timely and reasonable manner prior to certification of the revenue base. The preliminary cost base shall be established in accordance with regulations proposed by the commissioner and approved by the [Health Care Administration] board. *[N.J. S.A.* 26:2H–2(k)].[2]

---

[1]Although the screening formulae are different, both direct patient care costs and indirect patient care costs are governed by a system of "incentives" and "disincentives" designed to promote hospital efficiency by containing costs. Guiding this system is the principle that if a hospital's costs are below the standard, it is operating more efficiently than its peers and should be rewarded with an "incentive." In such a case, the hospital is entitled to charge rates designed to provide it with income in *excess* of its costs in the amount of the incentive. *N.J.A.C.* 8:31B–3.24(b). Conversely, if a hospital's costs exceed the standard, it is deemed not to be operating as efficiently as its peers and is penalized with a "disincentive." *N.J.A.C.* 8:31B–3.24(c). In such a case, its rates will be set at a standard which will yield revenues less than the hospital's costs. *N.J.S.A.* 26:2H–18(d); *N.J.A.C.* 8:31B–3.7

[2]The ultimate goal of the HCFPA is for the HRSC to be able to fix a "certified revenue base" (CRB) for each hospital, to last for a number of years with only routine, periodic adjustments for inflation or extraordinary factors. *N.J.S.A.* 26:2H–2(*l*). The statute defines CRB as:

> [t]he preliminary cost base adjusted by the commission, as appropriate and necessary pursuant to regulations proposed by the commissioner and approved by the board, to provide for the financial solvency of a hospital which is properly utilized and which delivers, effectively and efficiently,

According to the language of the HCFPA, the financial elements of the PCB should include:

> [t]he reasonable cost of the following, as defined in regulations proposed by the commissioner and approved by the board: direct patient care; principal and interest payments; paid taxes, excluding income taxes; educational, research and training programs, not otherwise paid for by the State; the provision of health care services to individuals unable to pay for them for reasons of indigency; bad debts, provided adequate recovery procedures are followed: preservation, replacement and improvement of facility and equipment subject to appropriate planning requirements; and reasonable working capital. Said financial elements may include, where applicable and appropriate, a reasonable return on investment where a hospital is operating efficiently and effectively. [*N.J.S.A.* 26:2H–18(d)]

After a PCB is set, a schedule of rates is established which:

> is the average amount of gross revenue a hospital shall charge and payors shall pay [3]

> (after application of payor differentials) per case for Services Related to Patient Care *in order to produce net revenue equal to the Preliminary Cost Base.* The Schedule of Rates contains financial elements which are fixed relative to patient case volume and others which are variable. Hospitals' projections of patient mix and volume will directly affect the alignment of collection of revenue through per case payments or charges with the Schedule of Rates. *N.J.A.C.* 8:31B–3.37. [Emphasis added.]

This language accords with *N.J.S.A.* 26:2H–4.1(b) which provides in part that:

> [t]he schedule of rates shall be reasonable and sufficient to provide the revenue requirements of the preliminary cost base and shall be adjusted from time to time, as appropriate, to reach the certified revenue base. [Emphasis added.]

---

appropriate and necessary health care services of a high quality required by its mix of patients. [*Id.*]
According to the parties, the change over from the PCB to a CRB has not yet been made for any hospital in New Jersey.

[3]In addition, the rates paid by all payors may not be the same. Payor differentials may be granted by the HRSC where there are "quantifiable economic benefits rendered to the institution or to the health care delivery system taken as a whole." *N.J.S.A.* 26:2H–18(b). Any differential to a payor is to be distributed among the payors and their schedule of rates may be adjusted, "if necessary, so that application of the percentage differential *will provide net revenue equal to the Preliminary Cost Base to the hospital.*" *N.J.A.C.* 8:31B–3.-39(a) (emphasis added).

In short, the point of the system is to reconcile two competing public interests: the provision of high quality medical services and the containment of costs. *N.J.A.C.* 8:31B–3.1. To do this, the statutes mandate that a rate schedule should not reflect a hospital's actual costs but rather what the HRSC determines is reasonable for the services provided to a specific mix of patients. Depending on the hospital's actual expenses, the rate schedule will provide either an incentive (an efficiency reward) or a disincentive (an inefficiency sanction) to the hospital. Whether an incentive or a disincentive results, one thing is firm: in establishing a rate schedule the HRSC must provide revenue sufficient to cover the PCB, *i.e.* the costs it has determined to be reasonably necessary to the efficient delivery of quality medical services. *N.J.S.A.* 26:2H–2(b).

On this backdrop, the fundamental fallacy in the HRSC's approach to the Gramm–Rudman reduction is clear. There is absolutely no evidence in this record that the HRSC ever considered the effect on the statutory and regulatory scheme of requiring New Jersey's hospitals to absorb $8.9 million dollars of the reduction. More particularly, there is no suggestion that the HRSC took into account the ability of New Jersey's hospitals to continue to function efficiently in light of such a substantial reduction in revenue. This is especially true in light of the fact that (at least theoretically) the hospitals' budgets were trimmed of fat by the HRSC prior to the establishment of the PCB and the rate schedule.

The HRSC argues that it has the authority to alter a PCB after it is set. Clearly, a PCB may be adjusted under specific circumstances provided in the statutes. *N.J.S.A.* 26:2H–18.1(b) and (d). None of those circumstances is present here. More importantly, NJHA correctly argues not that the HRSC lacks authority to adjust a hospitals' PCB but that it did not do so here. Nothing in this record supports the view that the HRSC gave any consideration whatsoever to adjusting any hospital's PCB. On the contrary, what the HRSC did was to require an

across the board revenue reduction to the hospitals of this State, ostensibly without regard to the far reaching effects of its actions.

In evaluating the various options open to it, the HRSC should have analyzed each in light of the statutory mandate and chosen the option which most closely conformed with the statutory scheme. In other words, if only one option allowed each hospital's schedule of rates to continue to produce revenue equal to its PCB, only that option would be entirely consonant with the HCFPA, and the HRSC would have been required to adopt it absent some compelling policy reason to the contrary. If more than one option met the requirements of the HCFPA, the HRSC would have been free to choose among them. Only in the event that no option could be formulated to meet the requirements of the HCFPA would the issue of preemption ever emerge. The HRSC thus turned the process on its head by accepting (according to the chairman's statement) the DOH's view that the Gramm–Rudman legislation had "overreaching powers that outweigh the hospital's reference to Chapter 83's guarantee of full financial elements." In effect, the HRSC failed to even consider the provisions of the HCFPA because it mistakenly believed it was free to do so. It was not.

On remand, the HRSC will be required to analyze all available options in light of the HCFPA, to assess the effect of each option on the individual hospitals of the state and to adopt an option consistent with the HCFPA if one exists. If the HRSC determines that no option is available which can be reconciled with the HCFPA, it will then be required to assess which option most fully meets the aims of the state act.

■ We turn next to the procedure by which this decision was made by the HRSC. In our view, the HRSC's allocation of the Gramm–Rudman reduction, which applies to every hospital for as long as Gramm–Rudman continues in effect, should have been treated as an administrative rule subject to the provisions

of the Administrative Procedure Act (APA). *N.J.S.A.* 52:14B–2(e) defines an administrative agency rule as follows:

(e) "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.

On its face, HRSC's Gramm–Rudman allocation falls outside of the three listed exclusions. Clearly it is neither a statement of internal discipline or management nor a communication between agency members which does not have a substantial impact on the rights of the regulated public. Rather it is of general applicability and cannot be confused with an adjudication. *Woodland Private Study Group v. State*, 109 *N.J.* 62, 75 (1987).

Instructive in this regard is *Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313 (1984), where the Supreme Court enunciated the considerations which singly or in combination would lead to the characterization of administrative agency action as rule-making. These include circumstances where the agency's action:

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [*Id.* at 331–332.]

In weighing the *Metromedia* factors, it seems clear that the HRSC should have invoked the rule making procedures of the APA in this case. The action which the HRSC took was intended to and did have wide coverage encompassing all hospitals subject to the regulations in the HCFPA and applies

uniformly to all similarly situated hospitals. Likewise, it "was intended to have continuing effect" and "to be a rule of unvarying application to all similar cases." 97 *N.J.* at 334. Further, the method selected for the reduction is neither expressly provided for nor clearly and obviously inferable from the enabling statutory authority. While the HRSC has the power pursuant to statute to adjust the PCB and accordingly, the schedule of rates, such power is limited to situations not here present. The final *Metromedia* factors also exist in that the allocation reflects an administrative policy that was not previously expressed by the agency in any formal way and requires a legal reconciliation of Gramm–Rudman with the HCFPA. Accordingly, on remand the full panoply of provisions prescribed by the APA should be invoked.

 In so ruling, we specifically reject the HRSC's contention that the procedures here constructively complied with the due process underpinnings of the APA. It is one thing to send out a series of options for review and quite another to propose a specific rule as contemplated by the APA. Here, there was no public statement of the purpose and effect of the rule, the authority pursuant to which it was adopted or its expected socio-economic impact as required by *N.J.S.A.* 52:14B–4(a)(2). Nor did the HRSC address the comments of objectors to Option 2 and proponents of other options or respond to the data, views and arguments contained in those submissions. *N.J.S.A.* 52:14B–4(a)(4). These requirements are fundamental. Without them there is no merit to the suggestion that the due process underpinnings of the APA were met.

We note that even if we were not of the view that the Gramm–Rudman allocation should have been promulgated as a rule, the HRSC's decision making procedure here would not have passed muster. In order to review an agency determination meaningfully under the HCFPA (or for that matter under any statute), the decision must be adequately supported by the record and fully explained. *Riverside General v. N.J. Hosp.*

*Rate Setting Comm'n, supra.* This record is devoid of any meaningful explanation as to how Option 2 was chosen. Apparently, the decision was not even memorialized by a resolution. Thus, even if we had not concluded that the HRSC should have promulgated an administrative rule to deal with the Gramm-Rudman allocation, the proceedings under review were deficient for failure of the HRSC to disclose the basis of its ruling.

This decision makes it unnecessary for us to address NJHA's additional contentions to the effect that the HRSC's actions deprived New Jersey's hospitals of property without due process or just compensation.

REVERSED AND REMANDED.