250 N.J. Super. 132 (1991)
593 A.2d 806
ST. BARNABAS MEDICAL CENTER, APPELLANT,
v.
NEW JERSEY HOSPITAL RATE SETTING COMMISSION, RESPONDENT.
COMMUNITY MEDICAL CENTER, APPELLANT,
v.
NEW JERSEY HOSPITAL RATE SETTING COMMISSION, RESPONDENT.
BERGEN PINES COUNTY HOSPITAL, APPELLANT,
v.
STATE OF NEW JERSEY, HOSPITAL RATE SETTING COMMISSION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 4, 1991.
Decided July 19, 1991.
*134 Before Judges MICHELS, BRODY and D'ANNUNZIO.
Barry H. Ostrowsky argued the cause for appellant St. Barnabas Medical Center (Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, attorneys; Barry H. Ostrowsky, Joseph M. Gorrell and Todd C. Brower, of counsel and on the brief).
Ivan J. Punchatz argued the cause for appellant Bergen Pines County Hospital (Cohen, Shapiro, Polisher, Shiekman and Cohen, attorneys; Ivan J. Punchatz, of counsel; Ivan J. Punchatz and Daisy B. Barreto, on the brief).
Frank R. Ciesla argued the cause for appellant Community Medical Center (Giordano, Halleran and Ciesla, attorneys; Frank R. Ciesla, of counsel; Elizabeth Dusaniwskyj, Joseph M. Gorrell and Todd C. Brower, on the brief).
Eileen C. Stokley argued the cause for respondent Hospital Rate Setting Commission of the State of New Jersey (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Eileen C. Stokley, on the brief).
*135 J. Lila Steele, Assistant Deputy Public Advocate argued the cause on behalf of respondent Wilfredo Caraballo, Public Advocate (Wilfredo Caraballo, attorney; J. Lila Steele, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
In these appeals, St. Barnabas Medical Center (St. Barnabas), Community Medical Center (Community) and Bergen Pines County Hospital (Bergen Pines) challenge a final administrative action of the New Jersey Hospital Rate Setting Commission (Commission) taken on December 10, 1990 that approved a settlement plan proposed by the Department of Health to dispose of numerous outstanding hospital rate appeals. The voluntary settlement program contained a two-tier cap on the amount of settlement and cash flow dollars that each hospital could collect in 1991 based upon each hospital's 1991 revenue requirements and financial hardship. The three hospitals here involved challenge that final administrative action, contending that the adoption of the cap on 1991 rates, as adjusted by the Commission, constitutes a rule not adopted in compliance with the Administrative Procedures Act. Alternatively, the three hospitals argue that the Commission's action was arbitrary and unreasonable because there was no rational relationship between the amount of the cap and the purpose for which it was adopted and it unfairly penalized each of them for exercising their right of appeal. We now consolidate these appeals.
By way of background, the comprehensive system of hospital rate setting, under which these appeals arise, was established pursuant to authority granted the Department of Health by the 1978 amendment to the Health Care Facilities Planning Act (Act). N.J.S.A. 26:2H-1 to N.J.S.A. 26:2H-52, amended by L. 1978, c. 83 (effective July 20, 1978). The Act, as originally enacted in 1971, had authorized a program for the regulation of hospital rates charged to Blue Cross and State governmental *136 agencies (such as Medicaid), as a means of containing the spiraling costs of hospital care. L. 1971, c. 136, § 18. See In re 1976 Hosp. Reimbursement Rate for William B. Kessler Mem. Hosp., 78 N.J. 564, 566-67, 397 A.2d 656 (1979). In 1978, the Legislature amended the Act, establishing a new system of hospital rate setting. L. 1978, c. 83. See In re Schedule of Rates for Barnert Mem. Hosp., 92 N.J. 31, 35-36, 455 A.2d 469 (1983). Regulatory authority was extended to cover the rates of reimbursement for hospital services charged to all payers subject to the State's jurisdiction, N.J.S.A. 26:2H-18(b), and payment of the financial losses from hospital services to indigent patients was made an express element to be included in the rates for all payers. N.J.S.A. 26:2H-18(d).
Administration of the rate setting system was delegated to the Department of Health, N.J.S.A. 26:2H-1, which adopts rules with the approval of the Health Care Administrative Board (HCAB). N.J.S.A. 26:2H-5(b). A "preliminary cost base" and a corresponding schedule of rates are to be proposed by the Commissioner of Health in accordance with regulations. N.J.S.A. 26:2H-4.1(b), -18(b). Plenary power to approve the cost base and the schedule of rates is vested in the Commission, a public body of five members, comprised of the Commissioner of Health, the Commissioner of Insurance and three members of the public appointed by the Governor. N.J.S.A. 26:2H-4.1(a) and (b). The Commission is authorized to approve the preliminary cost base and schedule of rates, and make "adjustments" to them. N.J.S.A. 26:2H-4.1(b); N.J.S.A. 26:2H-18.1(b), (c) and (d).
In recognition of the complexity of implementation of a comprehensive rate setting system, the Legislature permitted a phasing of hospitals into the system over a period of time, with all hospitals in the State to have an appropriate "preliminary cost base" and schedule of rates by January 1, 1983. N.J.S.A. 26:2H-4.1(b). In further recognition of the major effect the introduction of the new system could have upon hospital administration, the Legislature expressly permitted the initial "preliminary *137 cost base" to include costs in excess of those which were truly necessary for efficient and effective operations so long as the excess costs were gradually eliminated. N.J.S.A. 26:2H-2(k). It envisioned that after the transition to the new system had been accomplished and experience had been gained, the Department of Health would move toward fixing a "certified revenue base" for each hospital, to last for a number of years with periodic adjustments for inflation or deflation; industry wide changes in the efficiency of delivering health care services; and for each hospital's actual changes in volume and case mix. N.J.S.A. 26:2H-2(l); N.J.S.A. 26:2H-18.1(b). To date, however, the transition to a "certified revenue base" has not occurred.
The present methodology for the hospital rate setting system found at N.J.A.C. 8:31B-3.1 to N.J.A.C. 8:31B-3.90 creates a prospective rate of reimbursement in advance of actual treatment, which is related to hospital resources consumed in treating categories of illnesses. Each category of illness, referred to as "Diagnosis Related Grouping," reflects a variety of hospital costs. These hospital costs are derived from the actual expenses of a hospital during a given base year. N.J.A.C. 8:31B-3.3, -3.4, -3.5 and -3.16. While there are many components and calculations in the rate setting process, generally a hospital's base year costs are first allocated into the major categories of direct patient care costs and indirect patient care costs. N.J.A.C. 8:31B-3.18 to N.J.A.C. 8:31B-3.24.
Discrete grouping of costs in both major categories of direct and indirect patient care costs are screened for reasonableness, according to different formulae, by comparison to the base year costs of other hospitals in the peer group. If a hospital's own unit cost is above the particular standard in the formulae, the excessive cost (or "disincentive") is deducted from further calculations. On the other hand, if a hospital's base unit cost is below the standard it may earn additional amounts above its own costs, up to the amount of the standard, as "incentives" or rewards for its cost efficient. N.J.A.C. 8:31B-3.23 and 3.24. *138 See Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n, 98 N.J. 458, 462-64, 487 A.2d 714 (1985). See also New Jersey Hosp. Assoc. v. New Jersey State Dept. of Health, 227 N.J. Super. 557, 548 A.2d 211 (App.Div. 1988).
After screening the direct and indirect costs for the base year, the aggregate amounts are adjusted by a capital facilities allowance and for losses due to bad debts and charity care. N.J.A.C. 8:31B-3.27; N.J.A.C. 8:31B-3.41. These amounts are further increased by economic and technology factors. N.J.A.C. 8:31B-3.26. The resulting amounts, after these adjustments, represent the "preliminary cost base" for the hospital, which is accompanied by a schedule of rates for producing sufficient revenue to correspond to the preliminary cost base. N.J.A.C. 8:31B-3.7; N.J.A.C. 8:31-3.38.
The hospitals can appeal their rates to the Commission pursuant to the procedures set forth in N.J.A.C. 31B-3.51. In addition, at the end of the rate year, hospitals report their actual data on volume, case mix and revenue for use in "final reconciliation," a process of comparing actual data collected by the hospital to revenue allowed under the approved schedule of rates. N.J.A.C. 8:31B-3.73. See In re 1982 Final Reconciliation Adjustment for Jersey Shore Med. Center, 209 N.J. Super. 79, 84, 506 A.2d 1269 (App.Div. 1986). At final reconciliation, actual net revenue is compared to approved net revenue to calculate either an overcollection or undercollection by the hospital. If there was an undercollection, that amount plus interest is added to the hospital's rate schedule for the next year. N.J.A.C. 8:31B-3.75.
Due to the mounting backlog of outstanding rate appeals and final reconciliations, in 1986 the Commission began to develop informal methodologies to grant cash flow infusions, known as "cash flow adjustments." These cash flow adjustments are informal supplements to hospital rates, serving as advances while rate appeals and final reconciliations are outstanding. *139 Any such informal interim relief as a cash flow advance is ultimately factored into the final reconciliation.
By 1990, the ever-increasing backlog of rate appeals and final reconciliations jeopardized the prospective nature of the hospital rate setting system. To study this problem, the Governor appointed a Commission on Health Care Costs to take testimony and documentation from interested parties and make recommendations on how to avert the approaching crisis in health care costs. The Commission on Health Care Costs' Report, "Cost Accessibility Responsibility Efficiency for New Jersey" ("CARE"), was issued on October 1, 1990. The report documented the worsening crisis of health care costs, including an alarming increase in the costs of hospital care, doctor's visits and health insurance. The astronomical increase in health insurance rates has been devastating to New Jersey residents. One million New Jersey residents have no health insurance and the number is rising. New Jersey hospital costs have jumped 60 percent since 1983.
The Commission on Health Care Costs developed a comprehensive 10-point plan containing 90 specific recommendations, including one recommendation pertaining directly to hospital rate setting reform. The Commission on Health Care Costs suggested that the numerous outstanding rate appeals be resolved before implementing other reforms. To avoid the devastating effect that this would have on hospital rates, the Commission on Health Care Costs also recommended that rate increases from the adjudicated appeal backlog not increase any hospital's rates by more than three percent.
On November 19, 1990, the Department of Health issued a memorandum to all hospitals describing a voluntary settlement program modeled after the recommendations contained in the CARE Report. The program's goal was to eliminate both the rate appeal and final reconciliation backlogs, which would return the system to a prospective one and toward a "certified revenue base" system, and to provide stable cash flow to *140 hospitals during 1991. Attached to the November 19, 1990 memorandum was an offer of settlement of all issues affecting the disposition of the Chapter 83 schedule of rates for all years including 1990 and Chapter 83 final reconciliations for all years including 1988. The offer contained the following caveats:
The offer is expressed in 1991 dollars, the year during which (subject to the collection period policies described below) your hospital will begin to collect any agreed-upon settlement.
* * * * * * * *
If you agree to accept this offer, and it is approved by the Hospital Rate Setting Commission, the Department will generally propose that your hospital collect the payments over the 12 month period beginning in January 1991. The only exception is that the Department may shortly propose a statewide policy limiting the aggregate impact of some or all 1991 rate changes, which could result in collection of some settlement revenue during later years. The amount of this settlement will be reduced by any cash flow adjustment to reflect an undercollection for 1988 or prior years.... [Emphasis added].
The Department of Health projected that if all hospitals accepted the proposed settlements and cash flows were processed according to the most recent informal cash flow methodology, then the health care system in New Jersey would experience an additional $1 billion increase in 1991 hospital rates.
On December 6, 1990, in order to reduce the impact of this $1 billion increase, the Department of Health proposed to the Commission that the settlement program's effect on hospital rates be spread out over more than one year. Since settlements, cash flow, adjustments and final reconciliations are all interactive, the Department of Health proposed a one year cap on settlements, cash flows and final reconciliations to meter the flow of money into the health care system. As proposed, most hospitals were expected to receive their full amount of settlements and adjustments within one or two years. On December 10, 1990, the Commission passed a two-tiered cap, substantially the same as that proposed by the Department of Health, whereby a hospital not participating in the voluntary settlement program would have a 3% cap of its preliminary 1991 gross revenue requirements placed on its 1991 cash flow adjustments. A hospital agreeing to a settlement of past appeals would have *141 its funds from the settlement plus any cash flow adjustments for 1990 and 1989 capped at 6.5% of its preliminary 1991 gross revenue requirements. Additionally, the Commission members became concerned that the imposition of a cap could cause some hospitals to become insolvent. Therefore, the Commission formed a task force to establish criteria for exceptions to the 1991 cap for those hospitals with "severe financial detriment." 79 of the 86 hospitals participated in the program.
St. Barnabas, Community, and Bergen Pines challenge the Commission's voluntary settlement program. Community rejected its settlement offer because an agreement could not be reached on the amount and it did not want its settlement spread over more than one year. According to Community, it is owed $11,600,000. However, since it rejected the settlement offer, and therefore, is subject to the 3% cap of its approved gross revenue requirements for 1991, it will only receive $4,426,007 factored into its 1991 rates. The remaining amount of approximately $7,173,993, along with other additional dollars that it subsequently receives pursuant to its rate appeals cannot be factored into its rates until subsequent rate years, again presumably subject to a similar cap. St. Barnabas claims that since it rejected the settlement offer and is subject to a 3% cap of its approved gross revenue requirements for 1991, it will only receive $5,918,721 factored into its 1991 rates out of the $19,109,790 that is owed to it. It also argues that the remaining amount of $13,191,069, along with other additional dollars that it subsequently receives pursuant to its rate appeals and final reconciliations cannot be factored into its rates until subsequent rate years, again presumably subject to a similar cap. Finally, Bergen Pines reached a settlement with the Department of Health at an amount higher than the original offer and the settlement was approved by the Commission on December 20, 1990. Bergen Pines then applied for an exception to the cap in accordance with an established procedure arguing that its debt to Bergen County for supplies, expenses and payroll should not be considered a long-term debt but rather *142 treated as a trade payable. The Commission denied Bergen Pines' application for an exception to the cap, finding that Bergen Pines did not meet the exception's criteria. Bergen Pines claims that notwithstanding the voluntary rate settlement and approved cash flow adjustments totaling $58,943,459 and gross revenue requirements of $93,552,193, it will only be allowed to collect $6,080,893 in 1991 because of the settlement caps.
St. Barnabas, Community and Bergen Pines contend that the Commission's adoption of the caps on 1991 rate adjustments constituted a rule of general application which was not adopted in compliance with the Administrative Procedures Act, N.J.S.A. 52:14B-1 to N.J.S.A. 52:14B-15, and therefore, the two-tier cap program is invalid and unenforceable. We agree and reverse.
Administrative agencies possess wide latitude in selecting the appropriate procedures to effectuate their regulatory duties and statutory goals. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 333, 478 A.2d 742 (1984); In re the Petition By Controlled Cable Corporation, 95 N.J. 473, 485, 472 A.2d 130 (1984); In re Kallen, 92 N.J. 14, 24-25, 455 A.2d 460 (1983); Texter v. Department of Human Serv. Dept., 88 N.J. 376, 385, 443 A.2d 178 (1982); Board of Educ. of City of Plainfield v. Cooperman, 209 N.J. Super. 174, 207, 507 A.2d 253 (App.Div. 1986), modified, 105 N.J. 587, 523 A.2d 655 (1987). However, this flexibility does not allow an agency to ignore the dictates of the Administrative Procedure Act. Accordingly, an agency's discretion in choosing a procedure most suitable to achieve its regulatory arm is not unlimited. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. at 334, 478 A.2d 742; Crema v. New Jersey Dept. of Environmental Protection, 94 N.J. 286, 299, 463 A.2d 910 (1983). Moreover, in Crema v. New Jersey Department of Environmental Protection, 94 N.J. at 299, 463 A.2d 910, the Supreme Court recognized that:
When the agency is concerned with "broad policy issues" that affect the public-at-large or an entire field of endeavor or important areas of social concern, or the contemplated action is intended to have wide application and *143 prospective effect, rulemaking becomes the suitable mode of proceeding. [Crema v. New Jersey Department of Environmental Protection, 94 N.J. at 299, 463 A.2d 910 (Emphasis added)].
Thus, even though an agency is given statutory discretion, the manner in which this discretion is exercised may be governed by the procedural requirements of N.J.S.A. 52:14B-2(e). See Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. at 330-31, 333-34, 478 A.2d 742.
Generally, an administrative rule is an agency statement of general applicability and continuing effect that interprets law or policy or describes the agency's requirements. N.J.S.A. 52:14B-2(e) of the Administrative Procedure Act defines an administrative agency rule as follows:
(e) "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.
If an agency's action or determination constitutes a rule it must comply with the specific procedures of the Administrative Procedures Act. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. at 330-31, 334, 478 A.2d 742. Metromedia lists six relevant factors to be assessed in determining whether agency action constitutes rulemaking. The six Metromedia factors are:
[I]f it appears that the agency determination ... (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether *144 the essential agency action must be rendered through rule-making or adjudication. [Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. at 331-32, 478 A.2d 742].
"The Metromedia criteria, although originally formulated in a context that distinguished rulemaking from adjudication, essentially provide a test of when rulemaking procedures are necessary in order to validate agency actions or determinations." Woodland Private Study Group v. State, 109 N.J. 62, 68, 533 A.2d 387 (1987). "All six of the Metromedia factors need not be present to characterize agency action as rulemaking, and the factors should not be merely tabulated, but weighed." In re Request for Solid Waste Utility Customer Lists, 106 N.J. 508, 518, 524 A.2d 386 (1987). However, an exception has been created so that where the agency's action "is inferable from the enabling statute itself and does not reflect a new or changed position, it will not be held invalid for failure to meet rule-making procedural requirements." In re 1982 Final Reconciliation Adjustment for Jersey Shore Medical Center, 209 N.J. Super. 79, 87, 506 A.2d 1269 (App.Div. 1986). See Airwork Serv. Div. v. Director, Div. of Taxation, 97 N.J. 290, 301, 478 A.2d 729 (1984), cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).
First, the Commission's determination has wide coverage by applying to all hospitals, and therefore, the first element of Metromedia is fulfilled. Second, the caps are applied generally and uniformly to all similarly situated persons. Exceptions to the caps do not prevent them from being applied generally and uniformly to all similarly situated hospitals. Therefore, the second element too is fulfilled. Third, the caps operate prospectively, being passed in 1990 and becoming effective for the hospital rate year of 1991. Therefore, the third element of Metromedia is also fulfilled. Fourth, the caps are clearly and obviously inferable from the enabling statutory authorization. The enabling statute of the Commission is N.J.S.A. 26:2H-4.1(b) and provides that "the schedule of rates ... shall be adjusted from time to time, as appropriate, to reach the certified revenue *145 base." See also N.J.S.A. 26:2H-18.1(c) (codifying the Commission's power to adjust a hospital's schedule of rates). From the enabling statute's language it is clear that the Commission may limit the amount of hospital rate adjustments for any given year. See In re 1982 Final Reconciliation Adjustment for Jersey Shore Medical Center, 209 N.J. Super. at 87, 506 A.2d 1269. (Inferable from N.J.S.A. 26:2H-4.1(b) that the Commission is empowered to pass upon proposed final reconciliation methodology). Therefore, the fourth element of Metromedia remains unfulfilled.
Fifth, the caps were not "previously expressed in any official and explicit agency determination, adjudication or rule." The only mention of the caps was in the voluntary settlement program memorandum and the caps were not fully detailed. The memorandum stated in pertinent part, "The only exception is that the Department [of Health] may shortly propose a statewide policy limiting the aggregate impact of some or all 1991 rate changes, which could result in collection of some settlement revenue during later years." The Commission's voluntary settlement memoranda is not an "official and explicit agency determination, adjudication or rule," and therefore, the first prong of Metromedia's fifth element is satisfied. Also, the alternative second prong of Metromedia's fifth element, "whether the agency determination constitutes a material and significant change from a clear, past agency position or the identical subject matter," is satisfied because there is a clear past agency position as to hospital rate adjustments. The caps on 1991 hospital rate adjustments are the first caps to be placed upon the hospital rate setting system. The only statement concerning past caps on cash flow adjustments was from Commissioner Langevin, the Department of Health representative, who stated:
Just a couple factual observations. I do not believe that this is the first cap on cash flows. Like that the cash flow policy at one time called for a 50 percent cap, actually on the cash flows given to the hospitals. I believe that was in 1985, 1986 and then it went to a 100 percent cash flow method at that time.
*146 Without any further information, it is presumed that these are the first caps on cash flow adjustments, voluntary rate settlements and final reconciliations by the Commission. Although the present system of hospital rate adjustment is far from clear, the Commission's past position on cash flow adjustments was clear. Prior to January 1, 1991, final reconciliations and hospital rate appeals for a year were paid out in a lump sum by agreement or adjudication between the Department of Health or Commission and the hospital. Cash flow adjustments were provided to hospitals throughout the year to account for the projected undercollection while the rate appeals and final reconciliations were outstanding. After January 1, 1991 under the 6 1/2% caps, payments for the cash flow adjustments would be stretched out over a longer period of time with increases coming only at each year's end. Under the 3% caps, hospitals would continue to collect their final reconciliation and rate appeal monies when finalized but would be limited to only a 3% increase in cash flow adjustments derived from their approve gross revenue rates. Even with the granting of exceptions, the Commission's actions constitute a "material and significant change from a clear, past agency position."
Finally, the 1991 rate caps reflect a decision by the Commission on administrative regulatory policy in the nature of the interpretation of general policy. The Commission correctly points out that:
[the caps] constituted a temporary slowdown of positive adjustments (cash flow infusions and settlements) so that the system could withstand the massive settlement project in which 92% of all hospitals participated .... the Commission acted in a manner that was responsive to its purpose and function in containing hospital costs. See In re Solid Waste Util. Cust. Lists, supra, 106 N.J. at 520 [524 A.2d 386]; Texter v. Human Services, supra, 88 N.J. at 285 [385, 443 A.2d 178]. Here, the Commission balanced the hospital's interests with those of the payers, including Blue Cross and the public who pay directly or through insurance premiums.
However, the Commission's general policy was to eliminate the backlog of hospital rate appeals and final reconciliations in one year without having to pay the entire amount of money owed hospitals in the same year and to implement reform within the *147 arena of hospital rate setting. This was all done to bring the existing retrospective hospital rate setting system into a prospective one.
In analyzing and balancing the Metromedia factors, we conclude that the Commission's voluntary settlement program constitutes rulemaking. Five of the six factors are fulfilled, and when viewed in their entirety, the five fulfilled elements outweigh the remaining element. We recognize that both the State and the hospitals have important interests at stake. While it may be that the State, payors such as Blue Cross and Blue Shield, and the public cannot readily afford a $1 billion increase in 1991 hospital rates, the proper methodology to phase out and eliminate the backlog of hospital rate appeals and final reconciliations is the utilization of and strict compliance with rulemaking under the New Jersey Administrative Procedure Act. N.J.S.A. 52:14B-6 to N.J.S.A. 52:14B-15. As we said in American Emp. Ins. v. Commissioner of Ins., 236 N.J. Super. 428, 434, 566 A.2d 202 (App.Div. 1989)
Compliance with the Administrative Procedure Act and the Metromedia standards is not only a matter of fairness, but a means of informing regulators of possibly unanticipated dimensions of a contemplated rule. Here, for example, hearings on the new rule might well have presented the Commissioner with issues such as impact on solvency of given insurance companies and impact on market availability of voluntary private insurance, to be considered with the benefits of returning excess premiums to insureds of profitable companies.
Moreover, the exception to the requirement that rule-making by the Commission meet the procedural requirements of the Administrative Procedure Act created in Airwork and Jersey Shore Medical does not allow the Commission's caps on 1991 hospital rates to stand. Here, the Commission's power to impose those caps is inferable from the enabling statute. N.J.S.A. 26:2H-4.1(b). However, the 1991 rate caps create a new and different position in the way the Commission makes hospital rate adjustments. Therefore, the exception created by Airwork and Jersey Shore Medical is not available to the Commission.
*148 Accordingly, the Commission's two-tier voluntary settlement program promulgated by the Commission constitutes rulemaking in violation of the Administrative Procedures Act and is invalid and unenforceable. We are satisfied that all the remaining issues raised by St. Barnabas, Community and Bergen Pines are clearly without merit. R. 2:11-3(e)(1)(E).